In the Matter of SUMMIT FINANCIAL SERVICES, INC., Debtor.

Griffin Howell, III, Trustee, Plaintiff,

v.

The Bank of Newnan, Defendant.

Bankruptcy No. 97–11757–WHD.
Adversary No. 98–1109.

United States Bankruptcy Court,
N.D. Georgia,
Newnan Division.

Oct. 5, 1999.

Jacquelyn L. Kneidel, Wood, Odom & Edge, P.A., Newnan, GA, for The Bank of Newnan.

R. Brian Wooldridge, Mann & Wooldridge, Newnan, GA, for Griffin Howell, Trustee.

J. Littleton Glover, Jr., Glover & Davis, Newnan, GA, for First Citizens Bank.

W. Stell Huie, Long Aldridge Norman, LLP, Atlanta, GA, for Georgia Bankers Association.

John T. McGoldrick, Jr., Martin, Snow, Grant & Napier, Macon, GA, for Community Bankers Association.

## *ORDER*

W. HOMER DRAKE, Bankruptcy Judge.

This matter comes before the Court on Motion for Summary Judgment filed by the Defendant, The Bank of Newnan, in an adversary proceeding which the Chapter 7 Trustee commenced to recover allegedly preferential transfers and setoffs. Oral argument was heard on August 11, 1999. The issues involved in this controversy have been briefed by the litigants and three amicus curiae parties.[1] Having found this matter to constitute a core proceeding, *see* 28 U.S.C. § 157(b)(2)(F), the Court's decision is based on the following.

### PROCEDURAL HISTORY

First Citizens Bank (hereinafter "First Citizens") filed involuntary Chapter 7 bankruptcy petitions against W. Wilkins Kirby, Jr., Summit Financial Services, Inc., Incor Developers, LLC, Summit Mortgage Bankers, Inc., and Alpha Equity, Inc., on June 4, 1997 (the debtor entities are hereinafter collectively referred to as the "Debtors"). Orders for relief were entered in the cases on July 2, 1997. By order entered August 27, 1997, the four corporate estates were substantively consolidated. On October 30, 1998, Griffin E. Howell, III, in his capacity as Chapter 7 Trustee (hereinafter "Trustee"), filed a Complaint to Recover Preferential Transfers and Setoffs against The Bank of Newnan (hereinafter "Complaint").

### OVERVIEW OF CHECK KITING AND PROVISIONAL CREDIT

The Complaint arises out of a check kiting scheme orchestrated by the Debtors and involving two Newnan financial institutions, The Bank of Newnan (hereinafter "Newnan Bank") and First Citizens. "Check kiting consists of drawing checks on an account in one bank and depositing them in an account in a second bank when neither account has sufficient funds to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the kiter covers them by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the 'float time,' an artificial balance is created." *United States v. Stone,* 954 F.2d 1187, 1188 n. 1 (6th Cir.1992); *see also Nat'l State Bank v. Fed. Reserve Bank of New York,* 979 F.2d 1579, 1580 (3d Cir.1992) ("It is on the occasions when there is a delay in transmitting a check or in giving notice of its dishonor that a check kiter may create an opportunity to withdraw funds from an account in the depositary bank even though there are insufficient funds in the account in the payor bank."). In *Williams v. United States,* the Supreme Court noted the following example as typical of check kiting:

> The check kiter opens an account at Bank A with a nominal deposit. He then writes a check on that account for a large sum, such as $50,000. The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account. At the time of deposit, the check is not supported by sufficient funds in the account at Bank A. However, Bank B, unaware of this fact, gives the check kiter immediate credit on his account at Bank B. During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a $50,000 check on his account at Bank B and deposits it into his account at Bank A. At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his account there, and on the basis of that grant of credit

---

1. First Citizens Bank, the Georgia Bankers Association, and the Community Bankers Association are the amicus curiae parties. The two bankers' associations support The Bank of Newnan in this matter. First Citizens, on the other hand, supports the Trustee in his endeavor to set aside certain transfers and setoffs. Unlike the bankers' associations, First Citizens has a direct pecuniary interest in this lawsuit. This is because First Citizens is by far the largest unsecured creditor in this case.

pays the original $50,000 check when it is presented for collection.

By repeating this scheme, or some variation of it, the check kiter can use the $50,000 credit originally given by Bank B as an interest-free loan for an extended period of time. In effect, the check kiter can take advantage of the several-day period required for the transmittal, processing, and payment of checks from accounts in different banks....

*Williams v. United States*, 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (White and Marshall, JJ., dissenting). The "immediate credit" referred to by the Supreme Court is known as provisional credit in the banking trade.[2] For all intents and purposes, the experienced check kiter knowingly turns provisional credit into unauthorized loans.

It is the Court's understanding that virtually all banks permit advances, or extend provisional credit to their customers, on uncollected deposits.[3] The reason for this is that banks know that most deposited items will eventually be collected. Indeed, according to the Georgia Bankers Association, over 99% of deposited items are paid upon presentment. Amicus Curiae Brief of Georgia Bankers Association at 6–7 (No.

98–1109); *see also* U.C.C. § 4–210 official comment (1996) ("collection statistics establish that the vast majority of items handled for collection are in fact collected"). However, as a result of this practice of extending credit to customers prior to the actual collection of deposited items, banks assume the risk that monies advanced will not be supported by good funds. Banks are apparently willing to assume this risk to be competitive in the market for bank deposits.

### FINDINGS OF FACT

There is no dispute that prior to the involuntary filing, the Debtors used multiple accounts at both Newnan Bank and First Citizens to kite millions of dollars of checks.[4] The Debtors were able to create false balances in their accounts at Newnan Bank and First Citizens by systematically depositing into an account at one bank bogus checks that were drawn on accounts at the other bank. The Debtors succeeded in maintaining these fictitious balances by drawing against and taking advantage of the immediate provisional credit which both banks generously extended to them. Six debtor accounts at Newnan Bank were used in the scheme.[5]

2. The credit is provisional because the collecting bank can revoke it if the payor bank dishonors the check or item or if the drawer stops payment thereon. *See* U.C.C. § 4–214 (1996) ("If a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer....").

3. A bank's practice of extending provisional credit to a depositor is sanctioned by the Uniform Commercial Code. *See* U.C.C. § 4–201 (1996) ("before the time that a settlement given by a collecting bank for an item is or becomes final ... any settlement given for the item is provisional"); U.C.C. § 4–214 official comment (1996) ("Under current bank practice, in a major portion of cases banks make provisional settlement for items when they

are first received and then await subsequent determination of whether the item will be finally paid.").

4. None of the pleadings filed in connection with the motion for summary judgment reflect when the Debtors began kiting checks. However, the starting date is not important, as it is clear that the Debtors kited checks during the ninety (90) days prior to the bankruptcy filing.

5. Newnan Bank maintained three types of balances for the Debtors' accounts, a ledger balance, a collected funds balance, and an available funds balance. A ledger balance is total deposits, including uncollected deposits, minus all debits. A collected funds balance is limited to deposits actually collected, minus all debits. An available funds balance is the amount of funds available for immediate withdrawal at any point in time. During the ninety (90) days prior to the involuntary filing, the Debtors routinely had large negative collected funds balances in their accounts at

First Citizens notified Newnan Bank on April 4, 1997, that a check kiting scheme was being perpetrated on the two banks. Later that same day, Newnan Bank confirmed that the Debtors were kiting checks. The kite "collapsed" on April 4, 1997, as both banks stopped honoring the Debtors' checks.

Prior to the kite's collapse, Newnan Bank provisionally credited the Debtors' accounts for all deposits made up to and including April 3, 1997. All checks deposited by Kirby at Newnan Bank after April 1, 1997, were dishonored by First Citizens and returned to Newnan Bank as unpayable. However, Newnan Bank honored all checks written on the Debtors' accounts that were presented for payment through April 3, 1997.

There were three specific pre-petition banking transactions between Newnan Bank and the Debtors that are relevant to this proceeding. First, on March 28, 1997, Newnan Bank received a $90,963.69 wire transfer into account number 116053. The wire transfer originated out of a legitimate real estate closing conducted by the Debtors. Newnan Bank, however, inadvertently deposited the $90,963.69 into account number 116053. At the Debtors' request, Newnan Bank transferred the $90,963.69 to account number 118760 on April 4, 1997. The second important transaction at Newnan Bank concerned the deposit of a $99,000 certified check into account number 118760 on April 4, 1997. Like the wire transfer, the certified funds had nothing to do with the check kiting scheme. The certified check was not drawn on a First Citizens account. The Debtors made a third deposit of $1,500 into account number 118760, which also occurred on April 4, 1997. The Court does not know whether the $1,500 check was kite related.

At the time of discovery of the check kite, Newnan Bank had at least one debtor account (# 116053) with a negative collected funds balance of $71,440.15. Newnan Bank setoff the positive funds in account number 118760 (which apparently consisted of the wire transfer and the certified check) and applied them to zero out the negative balance in account number 116053. The setoff occurred on April 4, 1997, after discovery of the kite.

After Newnan Bank exercised the setoff and made itself whole, positive collected funds balances remained in the Debtors' accounts at the bank. Consequently, on April 14, 1997, Newnan Bank transferred approximately $117,000 to First Citizens. Unfortunately, after the kite collapsed, First Citizens had negative collected funds balances in excess of $1 million.

### CONCLUSIONS OF LAW

Three theories of recovery are set forth in the Trustee's Complaint. In counts one and two, the Trustee contends that Newnan Bank setoff certain funds in violation of 11 U.S.C. § 553. The Trustee alleges in counts three, four, and five that Newnan Bank received preferences which should be set aside under § 547 of the Bankruptcy Code. In count six, the Trustee urges the Court to exercise its equitable powers to allocate the check kiting losses between Newnan Bank and First Citizens. Newnan Bank contends that it is entitled to a judgment as a matter of law as to all counts of the Trustee's Complaint, except number five.[6]

---

both Newnan Bank and First Citizens. Stated differently, the debits to the accounts far exceeded the collected deposits made to those same accounts.

6. It appears that count five of the Complaint concerns Newnan Bank's seizure of account funds after the kite collapsed to reduce an outstanding line of credit that one of the Debtors owed to it. There appears to be some question as to whether the line of credit was secured or unsecured. As a result of this uncertainty, Newnan Bank acknowledged in its reply brief that summary judgment is not appropriate with respect to count five. Reply Brief of The Bank of Newnan at 2 (No. 98–1109).

## I. The Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, which is made applicable to bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, the Court will grant summary judgment only in the absence of any material issue of fact, so as to make the movant entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "Material facts" are those which might affect the outcome of a proceeding under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, a dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Lastly, the moving party, Newnan Bank in this case, has the burden of establishing the right of summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991); *Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir.1982).

In determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir.1985). It remains the burden of the moving party to establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* Fed.R.Civ.P. 56(e). Once the movant has made a *prima facie* showing of its right to judgment as a matter of law, the nonmoving party must go beyond the pleadings and demonstrate that there is a material issue of fact which precludes summary judgment. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Martin v. Commercial Union Ins. Co.*, 935 F.2d 235, 238 (11th Cir.1991). With these summary judgment principles in mind, the Court will turn its attention to the particulars of this case, addressing the preference issues first.[7]

## II. Application of 11 U.S.C. § 547(b) to the Instant Case

Count three of the Complaint concerns alleged preferences received by Newnan Bank before the check kite collapsed. The gravamen of the Trustee's Complaint is twofold. First, the Trustee contends that when a customer deposits checks for collection and then makes draws against provisional credit, a debt is created in favor of the bank until such time as the deposited item is finally settled through the check clearing process. Second, it is the Trustee's position that each time a deposited check is settled, a transfer occurs and the bank's debt is satisfied. According to the Trustee, these two principles combine to expose a bank to preference liability in a check kiting situation. Based on the theory just described, the Trustee contends that Newnan Bank received preferential transfers of at least $847,665 before the kite was discovered.

11 U.S.C. § 547(b) permits a trustee to avoid any pre-petition transfer of an interest of a debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

7. Because the Court has opted to discuss the preference issues first, the counts of the Trustee's Complaint will be addressed out of sequence.

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1996). Only subsections (b)(2) and (b)(5) are at issue in this controversy.

### A. Whether Newnan Bank had an Antecedent Debt Under § 547(b)(2)

■ There can be no preference unless an "antecedent debt" was in existence at the time of the alleged transfer. The timing of the debt in relation to the alleged transfer is not the focus of the present inquiry. Instead, Newnan Bank claims that it was never in a debtor-creditor relationship with the Debtors. As such, Newnan Bank contends that it was never owed a pre-petition debt for purposes of § 547(b)(2).[8]

"Debt" is defined in the Bankruptcy Code as a "liability on a claim." 11 U.S.C. § 101(12) (1996). The Code defines the term "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A) (1996).

In a bankruptcy proceeding, the definition of the term "debt" is the same as the definition of the term "claim." *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 557–58, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) (concluding that Congress intended for the two terms to be coextensive) (Blackmun, J., dissenting). The Supreme Court has further stated that "Congress intended to adopt the broadest available definition of [the term claim]." *Id.* at 558, 110 S.Ct. 2126; *see also Matter of Udell*, 18 F.3d 403, 406 (7th Cir.1994). Accordingly, to determine whether the Debtors owed a pre-petition debt to Newnan Bank, the Court must ascertain whether Newnan Bank had a claim against the Debtors.

■ "The validity of a creditor's claim is determined by rules of state law." *Grogan v. Garner*, 498 U.S. 279, 283–84, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (citation omitted); *see also Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 91 L.Ed. 162 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law.") (citations omitted), *reh'g denied*, 329 U.S. 833, 67 S.Ct.

---

**8.** The Georgia Bankers Association and the Community Bankers Association likewise argue that Newnan Bank was not owed a pre-petition debt by the Debtors. The bankers associations would have the Court rule that treating credit advances on uncollected deposits as antecedent debt would be contrary to the federal policy of expedited funds availability and would threaten the efficiency of the check collection process. Amicus Curiae Brief of Georgia Bankers Association at 5–8 (No. 98–1109); Amicus Curiae Brief of Community Bankers Association at 3 (No. 98–1109). The policy approach advocated by the amicus parties does find some support in case law. In *Laws v. United Missouri Bank of Kansas*, 98 F.3d 1047, 1051 (8th Cir.1996), *cert. denied*, 520 U.S. 1168, 117 S.Ct. 1432, 137 L.Ed.2d 540 (1997), the Eighth Circuit held that "routine advances against uncollected deposits do not create a 'debt' to the

bank." In so holding, the Eighth Circuit reasoned that

> a contrary rule would be inconsistent with the parties' expectations and their view of the banking relationship. A contrary rule would pin banks between the strong federal policy in favor of expedited funds availability and a Bankruptcy Code that treats advances as loans and their reduction as preferences. Such a rule might cause banks to terminate a service that is invaluable in today's economy. At a minimum, it would immensely complicate many bankruptcy proceedings.

*Laws*, 98 F.3d at 1051 (citation omitted). Notwithstanding the *Laws* decision, this Court is of the view that whether a debt exists is not an issue of public policy. Rather, in the case at bar, the Court must determine whether the Debtors had a legal obligation to pay money to Newnan Bank.

498, 91 L.Ed. 706 (1947). Justice Frankfurter aptly stated in his concurring opinion in *Vanston Bondholders* that

> [t]he business of bankruptcy administration is to determine how existing debts should be satisfied out of the bankrupt's estate so as to deal fairly with the various creditors. The existence of a debt between the parties to an alleged creditor/debtor relation is independent of bankruptcy and precedes it. Parties are in a bankruptcy court with their rights and duties already established, except insofar as they subsequently arise during the course of bankruptcy administration or as part of its conduct. Obligations to be satisfied out of the bankrupt's estate thus arise, if at all, out of tort or contract or other relationship created under applicable law. And the law that fixes legal consequences to transactions is the law of the several States.

329 U.S. at 169, 67 S.Ct. 237. Under these circumstances, Georgia law is the relevant "state law." [9]

9. It appears that Newnan Bank was organized under the laws of the State of Georgia, as were all of the Debtors. Furthermore, the check kiting activity took place locally. It appears to the Court that Georgia law should apply in this instance.

10. According to Newnan Bank, additional support for the agency theory is found in the Eleventh Circuit case of *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir.1988). In *Chase & Sanborn*, a check for $1.7 million was drawn on Colombian Coffee's account at Societe Generale and made payable to Banco Popular. *Id.* at 1198. It was learned at the clearing house that there were insufficient funds in Colombian Coffee's account to cover the check, as payment of the check would have resulted in a $1 million overdraft. *Id.* Societe General honored the check only after satisfying itself that wire transfers would be made into Columbian Coffee's account to prevent an overdraft. *Id.* Eventually, the debtor, whose principal also owned Columbian Coffee, wired money into Columbian Coffee's account to cover the $1.7 million check. *Id.* Six months later, the debtor filed bankruptcy, and the trustee sought to avoid the wire transfer as a fraudulent transfer.

Newnan Bank claims that a collecting bank merely acts as its customer's agent during the check collection process. In support of this proposition, Newnan Bank directs the Court's attention to § 11-4-201 of the Georgia Code. Section 11-4-201 provides in part that "[u]nless a contrary intent clearly appears and before the time that a settlement given by a collecting bank for an item is or becomes final, the bank, with respect to the item, is *an agent or subagent of the owner of the item* and any settlement given for the item is provisional." GA.CODE ANN. § 11-4-201 (1996) (emphasis added). This agency relationship has been recognized by Georgia courts.[10] In fact, the Court of Appeals of Georgia has stated that

> A check is a draft drawn on a bank, payable on demand. It is a negotiable instrument and is transferred by indorsement of the payee to the bank for the purpose of collection and the transferee bank obtains such rights as the transferor had. The bank then becomes

At issue in *Chase & Sanborn* was whether Societe General was an initial transferee of funds from the debtor under § 550 of the Bankruptcy Code. As part of its analysis, the Eleventh Circuit reasoned that "Societe Generale's decision to honor Colombian Coffee's check did not establish a debtor-creditor relationship between Colombian Coffee and Societe Generale." *Id.* at 1202. Rather, the Court concluded that Societe Generale simply functioned as a conduit of Columbian Coffee's account. *Id.* at 1201. Because the Eleventh Circuit concluded that no debtor-creditor relationship existed in *Chase & Sanborn*, Newnan Bank contends that it had no debtor-creditor relationship with its customers in this case.

Newnan Bank's reliance on *Chase & Sanborn* is misplaced. *Chase & Sanborn* is distinguishable and cannot be read to control the issue of whether there was antecedent debt in the case sub judice. In *Chase & Sanborn*, the Eleventh Circuit was not faced with the issue of whether the bank had a claim or debt against its depositor for preference purposes. In addition, the Eleventh Circuit specifically limited its holding. *Id.* at 1202 ("Under the particular facts of this case, the transaction does not fall within the provisions of the bankruptcy law on voidable transfers.").

the agent of the depositor for the purpose of collection. **The relationship between the depositor and the depositary bank on deposited checks is presumed to be that of principal and agent and not that of debtor-creditor.** *Green v. State,* 182 Ga.App. 695, 356 S.E.2d 673, 675 (1987) (citations omitted) (emphasis added); *see also Foster v. People's Bank,* 42 Ga.App. 102, 155 S.E. 62, 63 (1930) ("where checks or drafts are indorsed and deposited in a bank, the presumption is that the title does not pass and the relation of debtor and creditor does not exist until the collection has been made, and a credit made in anticipation of collection will be deemed provisional, and the bank may cancel the credit or charge back the paper to the customer's account if the check or draft be not paid on proper presentation") (citations omitted); *cf. Laws v. United Missouri Bank of Kansas,* 98 F.3d 1047, 1051 (8th Cir.1996) ("until dishonor, a bank that advances funds in the expectation that deposits will routinely be collected acts as a conduit for the depositor's financial transactions, not as a creditor"), *cert. denied,* 520 U.S. 1168, 117 S.Ct. 1432, 137 L.Ed.2d 540 (1997) (citation omitted).

■ In *Green* and *Foster,* the Court of Appeals of Georgia alluded to the presumption of an agency relationship between the customer and collecting bank on deposited items. The presumption breaks down and the relationship turns to that of debtor and creditor when the customer draws against the bank's provisional credit. This rule was first articulated in Georgia in *Pike v. First National Bank of Rome:*

It follows that while, where nothing else appears, a deposit to the credit of the depositor under a collection agreement gives rise to the presumption that there is an agency relation rather than a debtor creditor relation, and while, between the parties themselves, the bank may always charge back the uncollected check against its depositor whether it

has advanced funds thereon or not, nevertheless, the presumption of agency relationship, so far as third parties are concerned, only holds so long as no contrary agreement between the bank and the depositor is shown. **Proof that the bank did in fact not only credit the fund to the depositor but that it allowed the depositor to draw against that credit is, according to the better rule, conclusive evidence of a contrary agreement.**

*Pike v. First Nat'l Bank of Rome,* 99 Ga.App. 598, 109 S.E.2d 620, 625 (1959) (emphasis added). The Court interprets *Pike* to mean that the mere extension or posting of provisional credit does not give rise to a bank debt against its customer. The extension of provisional credit is similar to the issuance of a credit card. A credit card holder that has a $1,000 credit limit does not owe the issuer any money until the credit limit is reduced. *Laws,* 98 F.3d at 1050. That the mere extension of provisional credit does not trigger a debt obligation under the Uniform Commercial Code appears to be the prevailing law. *See id.* at 1050 ("A provisional credit, like a line of credit, is no more than the opportunity to obtain funds."); *Bernstein v. Alpha Assoc., Inc. (In re Frigitemp Corp.),* 34 B.R. 1000, 1015–16 (S.D.N.Y.1983), *aff'd,* 753 F.2d 230 (2d Cir.1985); *cf. Pereira v. United Jersey Bank, N.A.,* 201 B.R. 644, 659 (S.D.N.Y.1996) (mere extension of provisional credit not sufficient to create a security interest); *Marine Midland Bank–New York v. Graybar Electric Co.,* 41 N.Y.2d 703, 395 N.Y.S.2d 403, 363 N.E.2d 1139, 1145 (1977) ("the giving of a provisional credit is not a parting with value under the Uniform Commercial Code").

■ However, under Georgia law, when Newnan Bank credited the Debtors' accounts, and permitted the Debtors to withdraw the funds prior to their collection, and the Debtors did in fact withdraw the funds, Newnan Bank became a holder in due course as to the amounts withdrawn,

so as to be able to enforce payment of the withdrawn amounts against the Debtors. *Pike,* 109 S.E.2d at 626. It is the Court's view that Newnan Bank had a claim against the Debtors at that point in time when the Debtors made draws or advances on uncollected funds. Because the Debtors made draws on provisional credit on almost a daily basis, a pre-petition debt existed in favor of Newnan Bank. For purposes of § 547(b)(2), Newnan Bank was owed an "antecedent debt" during the preference period.

B. *Whether Newnan Bank Received More than it Would Have Received in a Hypothetical Chapter 7 Liquidation*

By its terms, § 547(b)(5) requires the Trustee to demonstrate that Newnan Bank received more money during the preference period than it would have received if (i) the transfers had not been made, (ii) the case were a Chapter 7 proceeding, and (iii) it received payment on its claims as provided for in the Bankruptcy Code. *Comm. of Unsecured Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.),* 59 F.3d 969, 972 (9th Cir. 1995), *cert. denied,* 516 U.S. 1140, 116 S.Ct. 973, 133 L.Ed.2d 893 (1996). In essence, the Court must compare what Newnan Bank received during the preference period with what the bank would have received if the case had been administered under Chapter 7 of the Bankruptcy Code. 5. COLLIER ON BANKRUPTCY ¶ 547.03[7] at 547–39 (15th rev.ed.1999).

 To make this comparison, the Court must necessarily determine Newnan Bank's pre-petition creditor status as either secured or unsecured. The distinction between a secured and unsecured creditor is crucial to this inquiry. That pre-petition payments to a fully secured creditor are not preferential because the creditor would not receive more than in a Chapter 7 liquidation is a well recognized rule of law. *Powerine Oil Co.,* 59 F.3d at 972; *Sloan v. Zions First Nat'l Bank (In*

*re Castletons, Inc.),* 990 F.2d 551, 554 (10th Cir.1993) (citation omitted); *Ray v. City Bank and Trust Co. (In re C–L Cartage Co.),* 899 F.2d 1490, 1493 (6th Cir. 1990); *Braniff Airways, Inc., v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1034 (5th Cir. 1987); *Emerson v. Fed. Savings Bank (In re Brown),* 209 B.R. 874, 885 (Bankr. W.D.Tenn.1997) ("Section 547(b)(5) is premised upon the Bankruptcy Code's acknowledgment that a valid security interest survives a liquidating bankruptcy, and to the extent that a creditor is fully secured, payment to that creditor in satisfaction of the security interest is not a preferential transfer."). Newnan Bank, with the full support of both banking associations, maintains that it was a secured creditor under Georgia law during the preference period. In contrast, the Trustee and First Citizens contend that Newnan Bank's pre-petition claims were not secured by collateral with value.

Applicable to this controversy is § 11–4–210 of the Georgia Code, which provides in pertinent part:

(a) **A collecting bank has a security interest in an item and any accompanying documents or the proceeds of either:**

(1) **In case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;**

(2) In case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given whether or not the credit is drawn upon or there is a right of charge-back; or

(3) If it makes an advance on or against the item.

(b) If credit given for several items received at one time or pursuant to a single agreement is withdrawn or applied in part, the security interest remains upon all the items, any accompanying documents, or the proceeds of either. For the purpose of this Code

section, credits first given are first withdrawn.

(c) **Receipt by a collecting bank of a final settlement for an item is a realization on its security interest in the item, accompanying documents, and proceeds.** So long as the bank does not receive final settlement for the item or give up possession of the item or accompanying documents for purposes other than collection, the security interest continues to that extent and is subject to Article 9 of this title . . . .

GA.CODE ANN. § 11–4–210 (1996) (emphasis added). Section 11–4–210(a)(1) specifically provides that a collecting bank has a security interest in an item "to the extent to which credit given for the item has been withdrawn or applied." *Id.* Newnan Bank contends that because provisional credit that was given to the Debtors was applied, the Court need not look beyond § 11–4–210 to reach the conclusion that it had a security interest in the kited checks deposited by the Debtors, and that it realized its security interest in the checks upon collection and final settlement. In the instant case, the Trustee does not dispute what the Georgia statute says. He concedes that the § 11–4–210 security interest protects a depository bank to the extent to which credit is advanced on uncollected deposits. Rather, the Trustee, with the help of First Citizens, attacks the value of Newnan Bank's security interest.

The Court understands the Trustee's defense to Newnan Bank's security interest argument to be rather simple. According to the Trustee, having a security interest in a kited check is akin to having a security interest in collateral that is either stolen or that does not belong to the borrower. Brief in Support of the Trustee's Response to the Bank of Newnan's Motion for Summary Judgment at 13 (98–1109). In addition, the Trustee submits that a kited check is a worthless check created by fraud. The Trustee further reasons that the value of a security interest in a worthless check has to be zero. Collateral that

either lacks value or does not belong to the borrower, so the Trustee contends, translates into the collateral holder's claim being unsecured and vulnerable to preference attack.

The Trustee's position that the check kite caused Newnan Bank's collateral to have no value is not supported by relevant case law. In *Laws*, the debtor took advantage of provisional credits provided to it by the United Missouri Bank. During the months leading up to the filing, the debtor maintained a large negative collected funds balance in its bank account. 98 F.3d at 1049. The debtor borrowed $4 million money from another bank to pay the negative collected funds balance in its account at United Missouri Bank. *Id.* After the debtor filed bankruptcy, the trustee sought to recover the $4 million transfer as a preferential payment. *Id.*

The Eighth Circuit, based on Missouri Revised Statute § 400.4–210(a)(1), which is identical to § 11–4–210(a)(1) of the Georgia Code, reasoned that "at all times, [the bank] had a security interest in the deposited checks and provisional Clearing House credits underlying [the debtor's] negative collected funds balance." *Id.* at 1052. Moreover, the Eighth Circuit rejected the trustee's argument that kited checks have no value, stating that "the deposited checks in an on-going check kite are not worthless, though some may be dishonored if the kite collapses." *Id.; cf. Matter of Smith,* 966 F.2d 1527, 1531 (7th Cir.1992) (Flaum, J., dissenting) (concluding that in a check kiting scheme, the check depositor does have something of value during the time period that the bank extends provisional credit), *cert. dismissed,* 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992). In *Laws*, the Eighth Circuit ultimately concluded that there was no basis for preference liability as the bank did not improve its fully secured position. *Id.*

Another check kiting case on point is *Emerson v. Federal Savings Bank (In re Brown),* 209 B.R. 874 (Bankr.W.D.Tenn. 1997). During the ninety (90) days prior

to filing bankruptcy, the debtor in *Brown* kited checks between two innocent banks. *Id.* at 877. To satisfy overdrafts that were created as a result of provisional credits that the banks had given him, the debtor deposited into his bank accounts money which he borrowed from a relative. *Id.* at 878. The trustee sued to recover the borrowed money. *Id.* at 879. Similar to the instant case, the *Brown* trustee also sought to avoid as preferences all of the kited checks drawn on accounts at one bank and deposited into accounts at the other bank, and vice versa. *Id.* at 878.

Relying on § 47–4–210 of the Tennessee Code Annotated, which provision is likewise identical to § 11–4–210 of the Georgia Code, the *Brown* court held that each defendant bank was the holder of "security interests in each item supporting deposits into accounts by the debtor at those banks." *Id.* at 886. In reaching that conclusion, the *Brown* court rejected the argument made by the trustee in that case that a security interest cannot attach to a fraudulent deposit. *Id.* The following passage sums up the *Brown* case:

> Under the undisputed facts of this case, when the two banks granted provisional credit to the debtor upon his various deposits, the debtor's checks to other creditors were honored. The banks gave value for the deposits when they honored checks drawn on those deposits. The debtor continued to make deposits into his accounts at each bank, which deposits were honored until his kite collapsed. **It can not be said that the items supporting the various deposits before that collapse were worthless, as each bank honored checks drawn on the other bank until the kite was discovered.** When the kite collapsed, the banks were left temporarily with uncollected funds' balances, but they each were the holders of security interests in the items supporting the uncollected deposits, and those items proved to have value. There is no proof that either bank was less than a holder in due course. The debtor obtained the loan from his uncle that was used to make sufficient deposits to eliminate the negative balances at both banks. At that point, the banks' security interests were satisfied and the banks were made whole. [T]hese banks did not benefit from any funds that they had reason to suspect or know were illegal or tainted.

*Id.* at 887. In *Brown*, the kite related transfers-the satisfaction of provisional credit upon final settlement of a deposited item—were shielded from preference attack under § 547(b) of the Bankruptcy Code "by the secured positions enjoyed by the depositary and collection banks." [11] *Id.; see also Pioneer Liquidating Corp. v. San Diego Trust & Sav. Bank (In re Consol. Pioneer Mortgage Entities)*, 211 B.R. 704, 711 (S.D.Cal.1997) (holding that based on § 4–210 of the UCC, there could be no recovery because the bank had a security interest in the deposited items to the extent that it allowed its customer to draw on provisional credit), *aff'd in part, rev'd in part* 166 F.3d 342, 1999 WL 23156 (9th Cir.1999) (table decision); [12] *Bernstein v. Alpha Assoc., Inc. (In re Frigitemp Corp.)*, 34 B.R. 1000, 1015 (S.D.N.Y.1983) ("Because the bank's security interest in the

---

11. At oral argument, First Citizens distinguished *Brown* from this case on the ground that both of the victim banks in *Brown* were made whole. (R. at p. 47, Oral Argument, August 11, 1999). Further, First Citizens contends that the "value" in *Brown* was supplied by the debtor's uncle. There is no indication that the *Brown* court would have ruled differently if the debtor's uncle had not come to his nephew's rescue at the time of the kite's collapse. Moreover, the *Brown* court made it clear that the pre-collapse deposits had value.

12. In an unpublished opinion, the Ninth Circuit affirmed that portion of the District Court's decision in *Consolidated Pioneer* which is applicable to the instant case. However, the decision was affirmed on different grounds. The Ninth Circuit actually adopted the policy holding in *Laws* that routine advances on provisional credit do not create antecedent debt. *Pioneer Liquidating Corp. v. San Diego Trust & Sav. Bank (In re Consol. Pioneer Mortgage Entities)*, 166 F.3d 342, 1999 WL 23156, at *1 (9th Cir.1999).

check and its proceeds was released when the provisional credit was repaid ..., the estate was not depleted and no preferential transfer occurred."), *aff'd*, 753 F.2d 230 (2d Cir.1985).

■ The Trustee and First Citizens contend that the Court should follow *McLemore v. Third National Bank in Nashville (In re Montgomery)*, 983 F.2d 1389 (6th Cir.1993). In *Montgomery*, the debtors kited checks between four banks. *Id.* at 1396. As a result of the kiting, Third National Bank had made more than $2 million of unauthorized loans to the debtors. *Id.* at 1389. During the ninety (90) days prior to filing, the debtors kited checks at other banks to partially satisfy Third National Bank's debt. *Id.* at 1391–92. Prior to the debt satisfaction, Third National Bank not only suspected the debtors of operating a check kite, but it also met with the debtors on at least three occasions to discuss the negative account balances. *Id.* at 1390–91. The other banks involved in the kite were not aware that provisional credit extended by them to the debtors on kited checks was used to pay the debtors' obligations to Third National Bank. *Id.* at 1395. In finding that Third National Bank essentially "shifted the kite" and received a preference, the Sixth Circuit explained that

> it seems to us that the debtors' estate was depleted here when the debtors elected to use the proceeds of unauthorized loans obtained from other banks to discharge their indebtedness to Third National. The assets obtained by kiting checks at Sovran Bank, Metropolitan Federal and Investors Federal were clearly in Mr. Montgomery's control, and his use of such assets to grease the squeaky wheel at Third National constituted a preferential transfer.

*Id.* at 1396. *Montgomery* does not help the Trustee's cause here, as it is easily distinguishable from the present case. First, *Montgomery* is not that helpful because it contains no discussion of a bank's security interest in deposited items.[13] Second, *Montgomery* involved the egregious act of one bank shifting kite losses to other banks. In the case sub judice, both banks were unwilling participants of a check kiting scheme, and Newnan Bank lacked the requisite knowledge to shift the kite to First Citizens. For these reasons, the Court does not view *Montgomery* as convincing authority.[14]

After reviewing the relevant case authority, the Court is persuaded by the

13. The Court notes that *Brown* originated in Tennessee, a Sixth Circuit state. *Montgomery* also originated in Tennessee, and it predates *Brown*. The judge that authored the *Brown* decision stated that "this court does not find *Montgomery* to be controlling nor particularly instructive on the issue of the secured status of these defendant banks." *Brown*, 209 B.R. at 879. This Court shares that sentiment.

14. In its amicus brief, First Citizens claims that *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644 (S.D.N.Y.1996), "rejected the *Laws* security interest rationale in a situation such as exists at the case at bar, holding that no security interest is created where the bank claiming the security interest has given a provisional credit." Corrected Amicus Curiae Brief of First Citizens at 21 (No. 98–1109). The Court disagrees with First Citizens' interpretation of *Pereira*. The *Pereira* court acknowledged that a bank does not have a security interest in a deposit under the UCC unless

and until a bank customer withdraws or applies provisional credit. 201 B.R. at 659. This court agrees with that statement and finds it to be consistent with both *Laws* and *Brown*.

First Citizens also cites *Marine Midland Bank–New York v. Graybar Electric Co.*, 41 N.Y.2d 703, 395 N.Y.S.2d 403, 363 N.E.2d 1139 (1977), for the proposition that "the granting of provisional credit is not a parting with value, as the provisional credit can always be withdrawn prior to final settlement." Corrected Amicus Curiae Brief of First Citizens at 21 (No. 98–1109). This Court agrees that the mere extension of provisional credit is not enough to create a security interest. *Marine Midland* does not cast doubt on any of the conclusions reached here today. In fact, *Marine Midland* provides that a "[a] bank, of course, gives value to the extent that a credit given for an item is withdrawn by the party whose account was credited." *Marine Midland*, 395 N.Y.S.2d 403, 363 N.E.2d at 1145.

*Laws* and *Brown* rationale. Accordingly, the Court is of the view that Newnan Bank had a security interest in the deposited items to the extent that the Debtors applied or made draws against provisional credit. That the deposited items at issue here were kited checks matters not. As such, the Court must reject the Trustee's position that Newnan Bank's security interest lacked value because the kited checks were worthless. A deposit is not worthless if it is honored by the drawee bank. Clearly, both banks in this check kite treated the Debtors' deposits as though they had value. During the kite, Newnan Bank and First Citizens, in conformance with a nationwide banking practice, voluntarily extended dollar for dollar credit to the Debtors immediately upon receipt of deposits. In other words, the kited checks were treated like hard currency. Now, two years after the kite collapsed, the Trustee and First Citizens claim that those same checks and deposits had no value.[15] In essence, the Trustee and First Citizens have invited the Court to ignore the reality of the situation as to what happened two years ago when both bank's honored the Debtors' checks. The Court must decline this invitation.

To further elaborate on the security interest issue, the Trustee's argument that a

lender cannot obtain a valid security interest in property that does not belong to the borrower is not applicable to the present case. This is not a case in which the Debtors, as borrowers, contracted to give a security interest in assets that they did not own. Here, the Debtors did not bargain for or even ask for the provisional credit, it was voluntarily given to them. Instead, this is a case in which Newnan Bank's security interest arose by operation of law, and its collateral came into existence at the time that the Debtors made use of provisional credit. *See* GA.CODE ANN. § 11–4–210 (1996). Newnan Bank realized on its security interest, or received value for its security interest, when First Citizens honored the Debtors' kited checks.

Accordingly, the Court is of the view that the Trustee is barred from preference recovery by Newnan Bank's § 11–4–210 security interest. Section 547(b)(5) of the Bankruptcy Code is not satisfied because there was no depletion of estate assets. Newnan Bank did not receive more than it would have received in a hypothetical Chapter 7 liquidation. Consequently, Newnan Bank is entitled to summary judgment as to count three of the Trustee's Complaint.

---

**15.** First Citizens has argued by way of illustration that Newnan Bank's collateral was worthless. First Citizens used the following example. Suppose that on a particular day during the check kite, the Debtors' accounts at Newnan Bank were overdrawn by $800,000. Assume, however, that Newnan Bank had a security interest in deposits that totaled more than $800,000. First Citizens argued that if a Chapter 7 petition had been filed on that particular day, Newnan Bank would have been "out" $800,000. The reason for this, according to First Citizens, is that Newnan Bank's collateral would have been worth nothing since the Debtors did not, on that particular day, have $800,000 of good funds on deposit at First Citizens, the drawee bank. (R. at pp. 43–44, Oral Argument, August 11, 1999).

For purposes of a preference analysis, the hypothetical Chapter 7 test must be constructed as of the filing date. *Palmer Clay Prod. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1936) ("Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results."); *Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.),* 990 F.2d 551, 554 (10th Cir.1993); *Neuger v. United States (In re Tenna Corp.),* 801 F.2d 819, 822–23 (6th Cir.1986); *Batlan v. Transamerica Commercial Fin. Corp.,* 237 B.R. 765, 770 (D.Or.1999). As it applies to this case, there is a problem with First Citizens' illustration. By the time the petition was filed in this case on June 4, 1997, Newnan Bank had realized on its security interest because its collateral (the deposits) had been repeatedly honored by First Citizens. Thus, it is not appropriate to simply isolate a particular day and declare that Newnan Bank's collateral lacked value on that day.

In count four of his Complaint, the Trustee alleges that Newnan Bank received preferential transfers of $611,356 after collapse of the kite. Admittedly, the Court does not know how the Trustee arrived at the $611,356 figure. The only post-kite transfers that the Court is aware of relate to Newnan Bank's seizure on April 4, 1997, of the $99,000 certified check, the $90,963.69 wire transfer, and the $1,500 check. It appears that the $99,000 certified check is the subject of count five of the Complaint, and the present summary judgment motion does not pertain to count five. The $90,963.69 wire transfer and the $1,500 check are not specifically mentioned anywhere in either the Trustee's Complaint or the parties' summary judgment pleadings. Because the Court does not know whether Newnan Bank had a security interest in the $90,963.69 wire transfer and the $1,500 check, summary judgment as to count four is not appropriate at this time.

### III. Application of 11 U.S.C. § 553 to the Instant Case

#### A. Section 553(a)(3)

■ In count two of his Complaint, the Trustee alleges that Newnan Bank violated the Bankruptcy Code by incurring debt to the Debtors during the ninety (90) days prior to filing, but after the check kite collapsed, for the sole purpose of obtaining setoff rights. The concept of setoff is governed by § 553(a)(3) of the Code, which states:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition;

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

11 U.S.C. § 553(a)(3) (1996). The typical scenario which § 553(a)(3) is intended to prevent has been described by the Eleventh Circuit as follows:

The section 553(a)(3) exception to setoff prevents the courts from rewarding creditors who persuade a debtor to engage in conduct which has the effect of impermissibly improving the creditor's position among the other creditors. Although the conduct may occur in many forms, the archetypal situation is the case where a debtor has a preexisting obligation to the creditor, and, in the months prior to debtor's filing for bankruptcy, the debtor pays back the creditor by "loaning" him money. Later the parties notice the two debts and engage in setoff, canceling both of them. In this archetypal situation, the creditor obtains the debt only to engage in setoff, thus this "loan" is disfavored by the setoff rules.

Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc.), 940 F.2d 1507, 1513 (11th Cir.1991), reh'g denied, 951 F.2d 366 (11th Cir.1991). For purposes of § 553(a)(3), the debt that the creditor owes to the debtor must be incurred for the specific purpose of achieving setoff rights. Official Comm. of Unsecured Creditors v. Mfr. and Traders Trust Co. (In re The Bennett Funding Group, Inc.), 146 F.3d 136, 140 (2d Cir.1998).

■ In the instant case, two legitimate deposits were made into the Debtors' accounts at Newnan Bank right before the kite collapsed, one was in the form of a $90,963.69 wire transfer on March 28, 1997, the other was a $99,000 certified check on April 4, 1997. While it is true that Newnan Bank setoff the account in question after discovery of the kite, it cannot be said that Newnan Bank received

the deposits into the Debtors' account—and thus became obligated to the Debtors for the amount of the deposits—for the sole purpose of obtaining setoff rights. At the time the deposits were received by Newnan Bank, the bank was not aware that a problem (i.e., the check kite) even existed. Newnan Bank contends, and the Court agrees, that there is simply no evidence that Newnan Bank put in place a plan to deliberately build up or stockpile funds in the Debtors' accounts in order to obtain setoff rights. As such, Newnan Bank is entitled to summary judgment as to count two of the Trustee's Complaint.

*B. Section 553(b)*

The Trustee contends in count one that he is entitled to a recovery under § 553(b) of the Bankruptcy Code to the extent to which Newnan Bank's "insufficiency" decreased during the ninety (90) days prior to the bankruptcy filing. Generally speaking, § 553(b) is designed to prevent one creditor from improving its position at the expense of other creditors. *Quinn v. Montrose State Bank (In re Intermountain Porta Storage, Inc.)*, 74 B.R. 1011, 1017 (D.Colo.1987). Any "insufficiency" can be determined by resort to a mathematical formula. If the insufficiency decreases, the creditor's financial position vis-a-vis the debtor improves. In contrast, if the insufficiency increases, the creditor's financial position has deteriorated.

Evidently, it is the Trustee's position that Newnan Bank's "insufficiency" decreased during the check kite as a consequence of the bank's receipt of the Debtors' deposits and the bank's subsequent application of those deposits to reduce the Debtors' negative bank balances. Section 553(b) provides:

(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(14), 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the

filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

11 U.S.C. § 553(b) (1996).

Section 553(b) only applies to pre-petition setoffs to the extent that the creditor's **unsecured position** improves during the ninety (90) days prior to filing. *Citizens Bank Of Rhode Island v. Hamilton (In re Process Valve Automation, Inc.)*, 217 B.R. 96, 97 (Bankr.D.R.I.1998). In the case at bar, Newnan Bank was a fully secured creditor during the check kite by virtue of § 11–4–210 of the Georgia Code. "[A] creditor cannot improve its position with respect to a secured claim. A secured claim therefore, cannot be subject to an insufficiency under section 553(b). Stated differently, only an unsecured claim can be subject to an insufficiency." *The Union Cartage Co. v. Dollar Sav. & Trust Co. (In re The Union Cartage Co.)*, 38 B.R. 134, 138 (Bankr.N.D.Ohio 1984); *see also Moody & Newton, Inc. v. Sun Bank/Suncoast, N.A. (Matter of Moody & Newton, Inc.)*, 64 B.R. 211, 212 (Bankr.M.D.Fla. 1986); *Quinn v. Montrose State Bank (In re Intermountain Porta Storage, Inc.)*, 59 B.R. 793, 795 (Bankr.D.Colo.1986), *aff'd*, 74 B.R. 1011 (D.Colo.1987). The Trustee cannot recover setoffs under § 553(b) due to Newnan Bank's status as a secured creditor during the check kite. As there was never an "insufficiency" as contemplated by § 553(b), it follows that Newnan Bank did not improve its secured position. That

being the case, Newnan Bank is entitled to summary judgment on count one of the Trustee's Complaint.

*IV. Application of 11 U.S.C. § 105 to the Instant Case*

Lastly, the Trustee suggests in count six of his Complaint that this case is a prime candidate for the exercise of the Court's equitable powers. The check kite resulted in more than $1 million in losses for First Citizens, while Newnan Bank escaped the kite unscathed. Because they believe this result is inherently unfair, the Trustee and First Citizens move the Court to shift a portion of the check kiting losses to Newnan Bank. According to the Trustee and First Citizens, such a loss allocation can be accomplished through § 105 of the Bankruptcy Code.

Section 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a) (1996). It has been said that the bankruptcy court's § 105 equitable powers "may not be exercised in a manner that is inconsistent with the other, more specific provisions of the Code." *Landsing Diversified Properties–II v. First Nat'l Bank and Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 601 (10th Cir.1990) (citations omitted), *modified, Abel v. West*, 932 F.2d 898 (10th Cir.1991); *see Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"); *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986). These cases make it clear that § 105 does not license a bankruptcy court to run roughshod over specific provisions of the Code. *See Ray v. City Bank and Trust Co. (In re C–L Cartage Co.)*, 899 F.2d 1490, 1494 (6th Cir.1990) (courts cannot use equitable principles "to disregard unambiguous statutory language") (citations omitted); *Johnson v. First Nat'l Bank of Montevideo, Minnesota*, 719 F.2d 270, 273 (8th Cir. 1983) (general equitable powers granted to the bankruptcy court by § 105 are not unlimited), *cert. denied*, 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). In addition, § 105 "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *Sutton*, 786 F.2d at 1308 (citations omitted); *S. Railway Co. v. Johnson Bronze Co.*, 758 F.2d 137, 141 (3d Cir.1985) (" § 105(a) does not authorize the bankruptcy court to create rights not otherwise available under applicable law"). Bearing these principles in mind, the Court will address the "equitable allocation" issue.

So far, the Court has concluded that Newnan Bank is entitled to summary judgment as to counts one, two, and three of the Trustee's Complaint. As to the transfers that occurred prior to the kite's collapse (count one), the Court found that the Trustee cannot establish all five elements of a preference. This is because Newnan Bank, as a secured creditor, did not receive more than it would have received in a hypothetical liquidation. As to count one, Newnan Bank has cleared the preference hurdle with no liability under § 547. Now, the Trustee deems it necessary to subject Newnan Bank to a § 105 "fairness hurdle." The Court will not sanction the use of § 105 as a fallback measure to a failed preference attack. It would be a slippery slope indeed for the Court to conclude on the one hand, that Newnan Bank has no preference liability, but to conclude on the other hand, that Newnan Bank must pay money because

fairness dictates that it do so. The Court is not aware of any authority for the interchangeable use of §§ 547(b) and 105(a), and the parties have not called the Court's attention to any. *Compare Rieser v. Landis & Gyr Powers, Inc. (In re Bownic Insulation Contractors, Inc.),* 134 B.R. 261, 266 (Bankr.S.D.Ohio 1991) ("[The creditor's] suggested use of this court's equitable powers to allow it to retain a preference payment is contrary to the goals of the Bankruptcy Code as codified under section 547. If the bankruptcy court used its equitable powers to disallow avoidance of a preference for equitable reasons, the purpose underlying § 547 would be vitiated."). It would be an abuse of discretion to use § 105(a) as a substantive recovery device when recovery has been denied under other provisions of the Bankruptcy Code. Stated differently, it is impermissible to use § 105 to create rights that would not otherwise exist. *Sutton,* 786 F.2d at 1308; *S. Railway,* 758 F.2d at 141.

■ Newnan Bank, like First Citizens, was not aware of the check kite. Upon learning of the kite, both banks understandably stopped honoring the Debtors' checks. Although Newnan Bank did seize some money in the Debtors' account, the propriety of which has yet to be determined, the Court suspects that most banks would have taken similar action under like circumstances. Even if the Court thought that the use of § 105 was appropriate in the instant case (which it does not), the Court would require some showing of bad faith or misconduct on the part of Newnan Bank.[16] There is no evidence of bad faith or misconduct in this case. Consequently, Newnan Bank is entitled to summary judgment as to count six of the Trustee's Complaint.

### Conclusion

After careful consideration of this matter, the Court concludes that Newnan Bank is entitled to summary judgment with respect to counts one, two, three, and six of the Trustee's Complaint. Newnan Bank is not entitled to summary judgment with respect to count four, and the allegations and issues presented in count five of the Complaint have not been addressed herein. Accordingly, based on the reasoning contained herein, Newnan Bank's Motion for Partial Summary Judgment is hereby GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED.**

---

**16.** An equitable allocation theory such as what the Trustee proposes here could be likened to the theory of equitable subordination of a claim. One of the factors that the Eleventh Circuit has instructed the lower courts to look for in subordination cases is inequitable conduct on the part of the claimant. *See Olympia & York Florida Equity Corp. v. The Bank Of New York (In re Holywell Corp.),* 913 F.2d 873, 880 (11th Cir.1990) (citation omitted).