_____

No. 95-3872
_____

Berry F. Laws, III, Trustee,      *
                                  *
     Plaintiff - Appellant,       *
                                  *
     v.                           *
                                  *
United Missouri Bank of Kansas    *   Appeal from the United States
City, N.A.,                       *   District Court for the
                                  *   Western District of Missouri.
     Defendant - Appellee.        *
                                  *
------------------------------    *
                                  *
The Missouri Bankers              *
Association,                      *
                                  *
     Amicus Curiae.               *
                                  _____

                    Submitted:  May 15, 1996

                        Filed:  October 21, 1996
                                  _____

Before FAGG, WOLLMAN, and LOKEN, Circuit Judges.
                                  _____

LOKEN, Circuit Judge.


        On October 20, 1986, Kroh Brothers Development Company ("Kroh")
wire transferred $4 million into its checking account at United Missouri
Bank of Kansas City ("UMB").  In February 1987, Kroh filed for Chapter 11
bankruptcy protection.  The trustee then commenced this proceeding to
recover the $4 million from UMB as an avoidable preference under the
Bankruptcy Code.  The district court[1] held that provisional credits UMB
extended before collecting

_____

        [1]The HONORABLE HOWARD F. SACHS, United States District Judge
for the Western District of Missouri.

Kroh's deposits were "antecedent debts" for purposes of 11 U.S.C. § 547(b)(2). However, the court concluded there was no preference, and granted summary judgment to UMB, because the $4 million transfer did not improve UMB's position as a fully secured creditor under Mo. Rev. Stat. § 400.4-210(a)(3). Laws v. United Mo. Bank of Kansas City, 188 B.R. 263 (W.D. Mo. 1995).

The trustee appeals, arguing that the transfer enabled UMB to avoid losses from Kroh's on-going check kiting scheme. While defending the district court's grant of summary judgment, UMB and The Missouri Bankers Association as amicus curiae argue that the court erred in treating provisional credits for uncollected deposits as antecedent debts. Though we disagree with the district court's interpretation of antecedent debt, we agree with its analysis of the Kroh/UMB relationship and therefore affirm.

Before filing for Chapter 11 protection, Kroh was a large real estate developer that regularly took advantage of the fact that UMB and other banks allowed Kroh to write checks on uncollected deposits. To illustrate how the bank collection process provided this opportunity, assume Kroh deposited a check drawn on another Kansas City bank into its UMB account on Monday afternoon. UMB provisionally credited Kroh's account for the amount deposited at the close of business that day, thereby permitting Kroh to write checks against the deposit. On Tuesday morning, UMB sent the check to the Kansas City Clearing House ("Clearing House") for collection. At Tuesday noon, the Clearing House presented the check to the drawee bank and provisionally credited UMB's Clearing House account. The drawee bank then had until midnight Wednesday to pay or dishonor the check. If the drawee bank paid, the provisional credits from the Clearing House to UMB and from UMB to Kroh's account became final. If the drawee bank dishonored the check before Wednesday, the Clearing House and UMB would reverse their provisional credits. See generally Mo. Rev. Stat. §§ 400.4-202, 400.4-215.

The ability to write checks against provisional credits gives the shrewd bank customer free use of someone else's money. Viewed charitably, this is called aggressive cash management. It also gives the dishonest customer a chance to write checks against non-existent deposits. When done systematically and fraudulently, prosecutors call this criminal check kiting. See Williams v. United States, 458 U.S. 279, 281 n.1 (1982). By whatever name it is called, when done with large amounts of money, it exposes banks to large losses, and they do not willingly tolerate the practice.

Because of these bank collection delays, at the time in question UMB calculated two balances for its customer accounts, the "ledger balance" and the "collected funds balance." The ledger balance was the sum of all collected and uncollected deposits, less debits to the account such as checks presented for payment. The collected funds balance consisted of collected funds less debits to the account. UMB's practice was to pay checks drawn on a customer's provisional credits. In other words, UMB refused to pay only if paying would result in a negative *ledger* balance. When paying resulted in a negative collected funds balance, UMB in effect advanced money it would owe the customer when (and if) all uncollected deposits were collected.[2]

In 1986, as Kroh approached insolvency, it increasingly used UMB's provisional credits. Kroh's average negative collected funds balance at UMB grew from $287,000 in March 1986 to $2,600,000 in September 1986. UMB was aware of this development and in June,

---

[2]Most banks give customers same-day or next-day availability for both local and nonlocal checks, and banks ultimately collect the vast majority of checks for which such provisional credit is granted. See Clark and Clark, The Law of Bank Deposits, Collections & Credit Cards ¶ 9.08 (1996 cum. supp. 2); Cooper, Checks Held Hostage - The Funds Availability Controversy, 102 Banking L.J. 532, 537 (1985). The U.C.C. encourages this practice. See Mo. Rev. Stat. § 400.4-210, Official U.C.C. Comment 1. The Expedited Funds Availability Act of 1987 mandates expedited availability in many situations. See 12 U.S.C. §§ 4001-4010.

with Kroh's consent, began charging Kroh interest on its month-end negative collected funds balance. Though Kroh avoided an overdraft position by maintaining a positive ledger balance, its negative collected funds balance continued to grow. On October 17, UMB concluded it was unacceptably at risk and advised Kroh that it would no longer pay on Kroh's uncollected deposits. On October 20, Kroh borrowed from another bank and wire transferred $4 million of the loan proceeds to its account at UMB, virtually eliminating Kroh's negative collected funds balance. This satisfied UMB's immediate concern, but it only succeeded in keeping Kroh out of bankruptcy until February 1987.

To recover this pre-petition transfer as preferential, the trustee must prove that Kroh's property was transferred to or for the benefit of UMB; that the transfer was made when Kroh was insolvent for the purpose of satisfying an antecedent debt to UMB; that UMB was an insider (because the transfer was made more than ninety days before Kroh's bankruptcy filing); and that the transfer enabled UMB to receive more than it would have received in a Chapter 7 liquidating bankruptcy. See 11 U.S.C. § 547(b)(1)-(5). In granting UMB summary judgment, the district court considered only whether the $4 million transfer satisfied an antecedent debt, and whether that transfer enabled UMB to improve its position as a creditor of Kroh. The court noted "strong evidence of a check kiting scheme in October." 188 B.R. at 271 n.16. Therefore, in reviewing the facts in the light most favorable to the trustee, we will assume UMB knew that Kroh was likely kiting checks.

On appeal, the trustee argues that Kroh's negative collected funds balance at UMB on October 20, 1986, was an "antecedent debt" to UMB, and that elimination of that balance improved UMB's position as a creditor. Those are the only issues before us, and the trustee must prevail on both to avoid summary judgment for UMB. In other words, we will affirm if we conclude either that there was no antecedent debt, contrary to the district court's conclusion, or

-4-

that the transfer did not improve UMB's position, as the district court held.  We of course review the district court's grant of summary judgment *de novo*.  See, e.g., <u>Thomason v. SCAN Volunteer Serv., Inc.</u>, 85 F.3d 1365, 1370 (8th Cir. 1996).

## I. The Antecedent Debt Issue.

The Code defines "debt" as a "liability on a claim."  11 U.S.C. § 101(12).[3]  When a debt was incurred is often important for preference purposes.  In this circuit, "a debt is incurred on the date upon which the debtor first becomes legally bound to pay."  <u>In re Iowa Premium Serv. Co.</u>, 695 F.2d 1109, 1111 (8th Cir. 1982) (en banc); <u>accord</u> <u>In re Gold Coast Seed Co</u>, 751 F.2d 1118, 1119 (9th Cir. 1985); <u>see generally</u> 4 Collier on Bankruptcy, ¶ 547.10 n.3 (15th Ed. 1996).

If a customer deposits a check, immediately withdraws the entire amount in cash, and the check is later dishonored, common sense and the Uniform Commercial Code tell us that the bank has a claim against the customer for the dishonored amount.  <u>See</u> Mo. Rev. Stat. § 400.4-214(a).  On the other hand, most bank deposits do not create claims *against* the bank customer.  Quite the opposite.  "A person with an account at a bank enjoys a claim *against the bank*

---

[3]"Claim" is defined as "a right to payment, whether . . . liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5).  Congress defined "claim" broadly so that "[a]ll claims against the debtor, whether or not contingent or unliquidated, will be dealt with in the bankruptcy case."  H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 180, <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963, 6141.  Though the bankruptcy concepts of "claim" and "debt" are generally coextensive, the debt issue in this case does not affect the bankruptcy court's authority to deal with all claims against Kroh's estate.  Indeed, to the extent that a check kiter, in moving money rapidly between a group of unsuspecting banks, generates negative collected funds balances which, in the aggregate, exceed the actual "kite debt," the rule urged by the trustee would seem to create redundant bankruptcy claims.

for funds in an amount equal to the account balance." <u>Barnhill v. Johnson</u>, 503 U.S. 393, 398 (1992) (emphasis added).  So at some point in the unsuccessful collection process, a "role reversal" occurs, with the putative customer-creditor becoming a customer-debtor of the bank.  There are three times when this type of debt might logically be "incurred" for preference purposes -- when the bank provisionally credits the customer's account for a deposited check, when the customer uses that provisional credit by drawing down the account, or when the deposited check is in fact dishonored.  The first two would expose banks to preference liability every time they advance funds against uncollected deposits.  The third would limit preference exposure to dishonor (ledger overdraft) situations.

    <u>Are Provisional Credits Depositor Debt?</u>  The district court ruled that a depositor incurs a debt when the bank provisionally credits the account for uncollected deposits, "regardless of whether the depositor makes use of this credit."  188 B.R. at 268.  Other courts have consistently refused to hold that the mere extension of provisional credit creates a bankruptcy debt.  <u>See</u> <u>Matter of Smith</u>, 966 F.2d 1527, 1535 & n.12 (7th Cir.), <u>cert. dism'd sub nom.</u> <u>Baker & Schultz, Inc. v. Boyer</u>, 506 U.S. 1030 (1992); <u>In re Frigitemp Corp.</u>, 34 B.R. 1000, 1015-16 (Bankr. S.D.N.Y. 1983); <u>In re Hudson Valley Quality Meats, Inc.</u>, 29 B.R. 67, 77 (Bankr. N.D.N.Y. 1982) (bank that granted provisional credit to a check kiter received no preference when deposited funds were collected).

    We find these decisions persuasive.  A provisional credit, like a line of credit, is no more than the opportunity to obtain funds.  Like a credit card, a line of credit does not create debt until the customer uses the credit to borrow funds or obtain goods or services.  <u>See</u> <u>In re Hersman</u>, 20 B.R. 569, 572 (Bankr. N.D. Ohio 1982).  Therefore, even if actual advances against uncollected deposits are loans, the depositor does not incur this debt when the

bank first provisionally credits the amount of an uncollected deposit to the depositor's account.

   Are Routine Advances Against Uncollected Deposits Depositor Debt? In this case UMB did not simply post provisional credits to Kroh's account. Kroh drew against its uncollected deposits, creating large negative collected funds balances. Abandoning the district court's analysis, the trustee argues that a depositor first incurs a debt when it draws against uncollected deposits. This is a more plausible position. Certainly the depositor receives tangible value when permitted to draw against uncollected deposits. At this point, for preference purposes, "the provisional credit [has] ripened into an interest in property of the Debtor." Matter of Smith, 966 F.2d at 1535.

   But to say that advances drawn by the depositor are his property does not necessarily mean that the depositor thereby incurs a debt. The bank is the depositor's agent during the collection process. See Mo. Rev. Stat. § 4-215, Comment 9. The bank routinely makes uncollected funds available to the depositor, not as a loan, but in recognition of the bank's anticipated debt to the depositor. Because the vast majority of deposits are collected, banks do not see the decision to make advances on uncollected deposits as a credit decision. It is a service decision, driven by laws such as the Expedited Funds Availability Act, and by the financial demands of bank customers. True, a debt will arise if deposited checks are dishonored. But until dishonor, a bank that advances funds in the expectation that deposits will routinely be collected acts as a conduit for the depositor's financial transactions, not as a creditor. See In re Chase & Sanborn Corp., 848 F.2d 1196, 1201 (11th Cir. 1988).

   The test for when a debt is incurred is whether the debtor is legally obligated to pay. Because the bank collection process is rapid, there are no prior cases determining whether a bank has a

legal right to recover advances on uncollected deposits *before those deposits are dishonored*. But it is worth noting that banks do not behave as though they have a right to repayment before dishonor. In this case, for example, when UMB concluded in June 1986 that Kroh's negative collected funds balance was too high, it did not demand repayment. Instead, UMB threatened to stop advancing credit on *future* uncollected deposits unless Kroh agreed to pay interest on the resulting negative balances, and UMB did not charge such interest until Kroh agreed to that change in their relationship.

We further note that federal bank regulators do not consider routine advances on uncollected deposits to be "debts" to a bank. The Office of the Comptroller of Currency in calculating whether a bank has exceeded its lending limit defines "extensions of credit" to exclude "amounts paid against uncollected funds in the normal process of collection." 12 C.F.R. §§ 32.2(j)(2)(v). Apparently, the Federal Reserve Board has long taken a similar view. <u>See</u> Clark and Clark ¶ 9.08, at S9-6 & n.48 (1996 Cum. Supp. No. 2).

Although the issue is not free from doubt, we conclude that routine advances against uncollected deposits do not create a "debt" to the bank.[4] A contrary rule would be inconsistent with the parties' expectations and their view of the banking relationship. A contrary rule would pin banks between the strong federal policy in favor of expedited funds availability and a Bankruptcy Code that treats advances as loans and their reduction as preferences. Such a rule might cause banks to terminate a

---

[4]The trustee relies on <u>In re Montgomery</u>, 123 B.R. 801 (Bankr. M.D. Tenn. 1991), <u>aff'd</u>, 136 B.R. 727 (M.D. Tenn. 1992), <u>aff'd</u>, 983 F.2d 1389 (6th Cir. 1993). Although we disagree with broad language in the opinions in that case, we agree with the result. <u>Montgomery</u> involved a bank that granted a check-kiting depositor a $500,000 line of credit to cover ledger overdrafts in a checking account. <u>See</u> 123 B.R. at 811. Draws on that line of credit, like any other, created depositor debt for preference purposes.

-8-

service that is invaluable in today's economy.  See In re Frigitemp, 34 B.R. at 1020.  At a minimum, it would immensely complicate many bankruptcy proceedings.[5]

What If the Advances Were Not Routine?  Our analysis thus far has dealt with advances that a bank routinely makes available against a depositor's uncollected deposits.  But this is not the usual case.  Here, as Kroh's negative collected funds balance grew rapidly in mid-1986, UMB viewed the situation with alarm.  Internal bank documents described Kroh's negative balance as "an interest free loan," and a bank officer testified, "we were lending money and the loan was not approved."  Concluding that the situation was unacceptable, UMB gave Kroh the option of eliminating the negative balances or paying interest on them.  When Kroh agreed to pay interest, its negative collected funds balance began to reflect a banking relationship having many indicia of a loan.  Had Kroh and UMB explicitly agreed to convert future negative collected funds balances into loans, Kroh would have been legally bound to pay such debts as incurred.  Whether such an agreement may here be implied is a disputed issue of material fact.  Thus, while we arrive at this conclusion by a different analysis, we agree with the district court that UMB was not entitled to summary judgment on the issue whether the $4 million transfer satisfied Kroh's antecedent debt to UMB.

---

[5]The trustee argues that, to determine the debt owing to banks before a check kite "collapses," one must "(i) examine and reconcile the bank statements, deposits, and paid checks from all the accounts in the kite with one another; (ii) remove kite checks and deposits from the system by all banks with negative collected balances by returning all items that were still subject to return under the rules of the Clearing House; (iii) the resultant balance is the actual debt owing to the bank based on the actual flow of funds."  Brief of Appellant 28.  We are loathe to adopt a rule that would require litigation of these issues every time a debtor in bankruptcy is alleged to have been "kiting checks."

## II. Whether UMB Improved Its Position.

The district court granted summary judgment on the ground that Kroh's antecedent debt -- its negative collected funds balance -- was fully secured and therefore the $4 million transfer did not improve UMB's position.  We agree.  When a check is deposited for collection, Missouri's Uniform Commercial Code grants the depository bank a security interest in the check and its proceeds "to the extent to which credit given for the [check] has been withdrawn or applied."  Mo. Rev. Stat. § 400.4-210(a)(1). Thus, at all times, UMB had a security interest in the deposited checks and provisional Clearing House credits underlying Kroh's negative collected funds balance.  Collection and final settlement realized UMB's security interest on those checks.  § 400.4-210(c).  The trustee concedes that UMB ultimately collected the checks that comprised Kroh's negative collected funds balance on October 20, 1996.  Thus, the district court's decision that UMB did not improve its fully secured position appears to state the obvious.  Cf. In re Two S. Corp, 875 F.2d 240 (9th Cir. 1989) (amount received from the disposition of collateral in a commercially reasonable manner determines its value).

The trustee urges a different result in this case because Kroh was allegedly kiting checks and kited checks are worthless.  But as the district court noted, the deposited checks in an on-going check kite are not worthless, though some may be dishonored if the kite collapses.  188 B.R. at 270, citing Mo. Rev. Stat. § 400.4-210, comment 3.  The trustee's theory finds no support in the language of § 547(b) of the Bankruptcy Code and Article 4 of the Missouri Uniform Commercial Code.  In these circumstances, we agree with the district court that UMB was a fully secured creditor.  As the court said in In re Frigitemp, 34 B.R. at 1015-16 (citation omitted):

Because the bank's security interest in the check and its proceeds was released when the provisional credit was repaid . . . the estate was not depleted and no preferential transfer occurred.  Whether a provisional credit is construed as a loan secured by the check, or simply as too "provisional" to be treated as debt for bankruptcy purposes, it cannot properly serve as the basis for preference liability.

The judgment of the district court is affirmed.

A true copy.

    Attest:

       CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.