**In re SOPHISTICATED COMMUNICATIONS, INC., Debtor.**

James Feltman, as Trustee for the Estate of Sophisticated Communications, Inc., Plaintiff,

v.

**City National Bank of Florida, Defendant.**

Bankruptcy No. 00–17635–BKC–RAM.
Adversary No. 02–1526–BKC–RAM–A.

United States Bankruptcy Court, S.D. Florida.

May 25, 2007.

Order Denying Rehearing Aug. 1, 2007.

Robert J. Edwards, Esquire, Behar, Gutt & Glazer, P.A., Aventura, FL, for Plaintiff.

Robert P. Frankel, Esq., Robert P. Frankel & Associates, P.A., Miami, FL, for Defendant.

### MEMORANDUM OPINION

ROBERT A. MARK, Bankruptcy Judge.

This adversary proceeding was tried on January 10, 2007, on the Amended Complaint filed by James Feltman, Trustee and Plaintiff ("Trustee" or "Plaintiff")

against Defendant City National Bank of Florida ("City National"). The only count that remained for trial was Count I, which alleges that certain transfers made by debtor, Sophisticated Communications, Inc. ("Debtor" or "Sophisticated") to City National as deposits into the Debtor's bank account at City National were avoidable and recoverable as preference payments, pursuant to Bankruptcy Code §§ 547 and 550. The Court has examined the evidence presented, including the Affidavit of Adriana Vidal, the Affidavit of Nelson Alemany, the Supplemental Affidavit of Nelson Alemany, and the Second Supplemental Affidavit of Nelson Alemany. The Court has also reviewed the applicable law and considered the arguments of counsel presented at trial and in their respective proposed findings of fact and conclusions of law. For the reasons that follow, the Court finds in favor of the Trustee and a final judgment will be entered against City National avoiding preferential transfers in the amount of *$690,934.54.*[1]

### *Factual and Procedural Background*

Most of the material facts and procedural history of this proceeding are set forth as stipulated facts in the Agreed Second Amended Pretrial Order agreed to by the parties (CP# 108). All of those stipulated facts are incorporated here by reference. Some are repeated or paraphrased below, together with some additional background relevant to certain pretrial Orders that narrowed the scope of this proceeding.

An involuntary Chapter 7 bankruptcy petition was filed against Sophisticated on August 28, 2000. An Order for Relief was entered on January 12, 2001. The case was converted to Chapter 11 on the Debtor's motion, but converted back to Chapter 7 on April 24, 2001.

Sophisticated maintained a business checking account at City National, a local banking institution, during the 90–day preference period in May 2000 through August 2000 (the "Sophisticated Account" or "Debtor Account"). Locin, a related company that is not a party to this lawsuit, also maintained a checking account at City National during that time period (the "Locin Account").

The Trustee filed a three-count Amended Complaint against City National on December 24, 2002 (CP# 7), alleging that City National received preferential or fraudulent transfers from the Debtor and its alleged alter-ego corporation, Locin, in the form of funds deposited with City National to cover overdrafts resulting from withdrawals from or checks written on the Debtor and Locin Accounts.

In Counts I and II, the Trustee alleged that Debtor's payments deposited into the Debtor Account (Count I) and into the Locin Account (Count II), which resulted in the cure of overdrafts, were avoidable preferences pursuant to 11 U.S.C. § 547. Pursuant to 11 U.S.C. § 550, the Trustee sought to recover from City National all of the combined transfers made during the relevant time period, $6,091,444.45 deposited into the Debtor Account and $8,601,995.95 deposited into the Locin Account. To support the claim in Count II that payments to satisfy Locin's overdrafts were preferences, the Trustee alleged that Locin overdrafts were antecedent debts of the Debtor because Locin was the Debtor's "alter-ego."

Count III arises from the same factual allegations as Count II, relating to payments into the Locin Account. In Count III, the Trustee alleged that the transfers

---

1. By separate Order, the Court is setting a briefing schedule and further hearing on whether the judgment should include pre- judgment interest and, if so, what is the appropriate starting date for calculating the interest and what interest rate should apply.

of funds from the Debtor to Locin are transfers avoidable under § 548 and that the transfers to City National to cover Locin's overdrafts render City National liable as an immediate transferee under § 550(a)(2). The fraudulent conveyance theory depends upon a finding that Locin is not the alter-ego of the Debtor, despite the allegations in Count II that Locin is the Debtor's alter-ego.

City National filed a Motion for Summary Judgment on October 28, 2003 (CP# 52), just two days before discovery was closed. The Motion was supported by the Affidavit of Nelson Alemany (CP# 53), City National's Executive Vice–President. Mr. Alemany analyzed all of the transactions in the two accounts during the preference period and prepared reports detailing all of the account transactions. The Affidavit attests that the overdrafts in the two accounts were "provisional credits" repaid by applying funds deposited by the account holder. Affidavit, ¶ 7. Although the Affidavit states that all of the overdrafts arose from provisional credits, Mr. Alemany's deposition testimony on December 5, 2003 (CP# 69) created genuine issues of fact with respect to the nature of the overdrafts, issues which are discussed later in this Opinion.

In July of 2004, the Court requested further briefing on the nature of the overdrafts. The Court had preliminarily concluded that deposits curing overdrafts arising from provisional credits were not recoverable as preferences. Specifically, on July 2, 2004, the Court entered its Order Requesting Further Briefing on Motion for Summary Judgment (CP# 66). That Order asked the parties to address, with record citations, whether the overdrafts in the Debtor and Locin Accounts described in the Amended Complaint arose from provisional credits on deposited items.

After completing a thorough review of the record, including the several memoranda filed by the parties, and after reviewing applicable law, the Court entered its June 26, 2006 Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment (the "Summary Judgment Order") (CP# 78). As discussed more fully below, the Summary Judgment Order focused on the difference between "collected funds overdrafts" arising from provisional credits and "ledger balance overdrafts." To the extent the Trustee sought to avoid transfers that reduced collected funds overdrafts resulting from provisional credits on deposited items, City National's Motion for Summary Judgment was granted. The Court held that City National had a security interest in the deposits that created the provisional credits and consequent overdrafts and, accordingly, that the bank was protected from preference liability for applying new deposits to reduce the collected funds overdraft incurred from the extension of provisional credit. However, the Court further held that transfers that may have reduced ledger balance overdrafts may be recoverable as preferences or fraudulent conveyances and that there were genuine issues of fact with respect to the nature of the overdrafts. Therefore, the Motion for Summary Judgment was denied to the extent of claims based on alleged repayment of ledger balance overdrafts.

### Further Proceeding Before Trial

By Order dated July 28, 2006 (CP# 82), the Court bifurcated the issue of whether Locin was the Debtor's alter-ego (the "Alter–Ego Issue") and scheduled a trial on the Alter–Ego Issue for September 11, 2006. Prior to trial, the Plaintiff abandoned his alter-ego claim. As a result, on September 13, 2006, the court entered an Order dismissing Count II (the alleged preferential deposits into Locin's account).

On January 4, 2007, shortly before the scheduled trial on Counts I and III, the Plaintiff stipulated to dismissal of Count III, which alleged a fraudulent conveyance of funds from the Debtor to Locin. As a result, and as framed in the Agreed Second Amended Pretrial Order, the only issue and corresponding claim to be determined by this Court is the claim in Count I of the Amended Complaint as modified by the Agreed Second Amended Pretrial Order. As limited further by the Summary Judgment Order, the remaining allegation is that Debtor's deposits into its City National bank account are avoidable as preferences to the extent the deposits cleared existing ledger balance overdrafts.

### The Ledger Balance Overdraft Payments

The Debtor would routinely deposit monies into the Debtor Account and would in turn routinely issue checks or make other transfers or withdrawals from the Debtor Account. Collected funds overdrafts occurred frequently in the Debtor Account because City National provided provisional credits to the Debtor on deposited items before the deposits cleared. During the preference period, negative ledger balances also occurred in the Debtor Account that were subsequently cleared as discussed below.

For preference analysis, the relevant time period for these overdrafts was from May 31, 2000 through and including August 7, 2000, ninety days preceding the filing of the involuntary bankruptcy petition ("Applicable Time Period"). On various days during the Applicable Time Period, the Debtor deposited sufficient sums of money into the Debtor Account to cure negative ledger balances (the "Ledger Balance Overdraft Payments").

The Detail of Transactions of the Debtor Account (# 1405718643), as stated in the Supplemental Affidavit of Nelson Alemany (CP# 85) and Second Supplemental Affidavit of Nelson Alemany (CP# 96), accurately reflects the Debtor Account activity. The Account Activity, Ledger Balance, and Negative Ledger Balances are also accurately stated in Exhibit A to the Affidavit of Adriana Vidal (CP# 88). The only disagreement between the parties is the legal effect of the Ledger Balance Overdraft Payments.

As described earlier, Plaintiff's Amended Complaint alleged that preferential payments into the Debtor's account exceeded $6,000,000. This figure was derived by adding the deposits on 22 different days. This methodology was rejected by the Court in the Summary Judgment Order, citing *In re Brown,* 209 B.R. 874 (Bankr.W.D.Tenn.1997). Instead, the Court determined that the Trustee's recovery would be limited to deposits curing the largest ledger balance overdraft during the Applicable Time Period.

The largest negative ledger balance in the Debtor Account during the Applicable Time Period occurred on July 19, 2000. The $690,934.54 negative ledger balance at the end of that day resulted from City National issuing a series of cashier's checks to the Debtor in an amount in excess of the cash and deposits in the account. Specifically, City National issued the following cashier's checks: check number 357201 in the amount of $38,081.23 payable to Network Communications; check number 357202 in the amount of $161,589.00 payable to Locin; check number 357206 in the amount of $159,201.00 also payable to Locin; check number 357207 in the amount of $171,100.00 payable to the Debtor; and check number 357208 in the amount of $169,505.00 also payable to the Debtor. The checks issued to the Debtor and to Locin were deposited in their respective accounts with the First National Bank of Homestead. These cash-

ier's checks were issued on July 19, 2006 at a time when the account ledger balance, including cash and deposited items, amounted to only $8,541.69.

On the following day, July 20, 2000, the Debtor made deposits to the account in excess of the $690,934.54 negative ledger balance thereby clearing the preceding day's negative ledger balance overdraft. Those deposits consisted of three deposits from Locin totaling $944,581.78, the sum of $135,263.75 from American Phonecard Corp., $33,030.00 from Pro–Telecard, and $162,142.47 from miscellaneous others. These deposits on July 20th are the sole focus of the Trustee's claims.

### Discussion

The Summary Judgment Order contains a thorough analysis of many of the legal issues which control the Court's decision. Therefore, significant portions of that Order are repeated here. The lengthy discussion of why transfers to clear collected funds overdrafts arising from provisional credits are not avoidable as preferences, is not directly relevant to the remaining claims. Nevertheless, this portion of the Summary Judgment Order is included to better explain why the July 19th ledger balance overdraft was a debt preferentially paid by the July 20th deposits.

### A. Deposits Applied to Reduce Overdrafts Arising From Provisional Credits Are Not Avoidable as Preferences or as Fraudulent Conveyances

A review of the Trustee's original claims begins with an analysis of the source of the overdrafts. The Alemany Affidavit, described earlier, states that the overdrafts in the Debtor and Locin Accounts arose from provisional credits on deposited items. This term, as used in banking, means that the account holders were given provisional credit on deposits before the deposited items cleared. In the ordinary course of banking, banks allow account holders to write checks or make withdrawals based upon the provisional credit even though the cash balance in the account reflects an overdraft. See In re Frigitemp Corporation, 34 B.R. 1000, 1014–1016 (S.D.N.Y.1983) (discussing in greater detail the provisional credit process under Article 4 of the Uniform Commercial Code).

Cases analyzing preference claims arising from reductions in overdrafts draw an important distinction between two types of bank balances, a "ledger balance" and a "collected funds balance." See, e.g., Laws v. United Missouri Bank of Kansas City, 98 F.3d 1047, 1049 (8th Cir.1996). The "ledger balance" is the sum of all collected and uncollected deposits less debits to the account, including withdrawals or checks presented for payment. This balance includes the provisional credits on deposited items before the deposited items clear. Id.

The "collected funds" balance does not give credit for uncleared deposits, but rather consists solely of the actually collected funds less debits to the account. Id. Thus, if a customer is given provisional credit for deposits, checks written against the provisional credit would create a negative collected funds balance, but no overdraft on the ledger balance. For example, assume that a customer with no cash in its account and no outstanding checks deposits $50,000 in checks and is granted a $50,000 provisional credit. If the bank honors $50,000 in checks written on the account, the customer would have a $50,000 negative collected funds balance, but a ledger balance of $0 ($50,000 in uncleared deposits minus $50,000 in honored checks).

Several courts have analyzed whether deposits by a debtor which satisfy or re-

duce a collected funds overdraft resulting from provisional credits are recoverable as preferences. For either of the reasons explained below, the decisions this Court finds persuasive have concluded that receipt and application of these deposits to reduce only negative collected funds balances arising from provisional credits are not avoidable as preferences.

### 1. *Provisional Credits Which Create the Collected Funds Overdrafts Are Not Antecedent Debts*

■ To recover a transfer as a preference, the Trustee must satisfy each of the elements of § 547(b).[2] The second element requires the Trustee to prove that the payment was made on account of an antecedent debt. While arguable that a depositor incurs a debt as soon as the bank grants a provisional credit, the prevailing view is that routine advances against uncollected deposits do not create a "debt." *Laws*, 98 F.3d at 1051; *In re Spring Grove Livestock Exchange, Inc.*, 205 B.R. 149, 155 (Bankr.D.Minn.1997). Therefore, as to any overdrafts at issue in this proceeding which are collected funds overdrafts arising from provisional credits, and absent any allegations that the negative cash balances were intended to be loans, the Trustee's preference claims fail since these collected funds overdrafts were not antecedent debts.

2. 11 U.S.C. § 547(b) provides:

the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
 (A) on or within 90 days before the date of the filing of the petition; or

### 2. *Application of Transfers to Satisfy Collected Funds Overdrafts Did Not Improve the Bank's Position Since the Transfers Satisfied Existing Security Interests in the Deposits Which Gave Rise to the Provisional Credits*

■ Pursuant to statutory and case authority, City National has a security interest in the deposited items that were provisionally credited by City National and created the collected funds overdrafts in the Debtor and Locin Accounts. As such, any payment to City National that satisfied its security interest was not a preferential transfer because it did not enable City National, as a secured creditor, to receive any more than it would have received in a hypothetical Chapter 7 liquidation as required by § 547(b)(5). Thus, any portion of the deposits applied by City National to existing collected funds overdrafts did not improperly diminish the Debtor's estate.

■ City National's security interest stems from Florida's Uniform Commercial Code. Pursuant to § 674.2101, Fla. Stat. (2002), collecting banks, such as City National in this case, have an automatically perfected security interest in deposited items and their proceeds, which security interest takes priority over all other security interests:

(1) A collecting bank has a security interest in an item and any accompanying documents or the proceeds of either:

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(a) In case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;

. . . .

(3) Receipt by a collecting bank of a final settlement for an item is a realization on its security interest in the item, accompanying documents, and proceeds. So long as the bank does not receive final settlement for the item or give up possession of the item or accompanying documents for purposes other than collection, the security interest continues to the extent and is subject to Chapter 679, but:

(a) No security agreement is necessary to make the security interest enforceable;

(b) No filing is required to perfect the security interest; and

(c) The security interest has priority over conflicting perfected security interest in the item, accompanying documents, or proceeds.

Thus, transfers premised upon items on which credit has been given or which has otherwise been applied cannot be avoided as preferential because the fifth element of a preference claim is not met in such cases. See In re Cannon, 237 F.3d 716 (6th Cir.2001) (applying Tennessee's version of UCC 4–210 and holding that because the bank acquired a security interest in a deposited item to the extent of the full face value of the item, the transfer could not be avoided by the trustee as a preference); Laws, 98 F.3d at 1052 (holding that under Missouri's version of UCC 4–210, bank held security interest in deposited checks, "[t]hus, the district court's decision that [the bank] did not improve its fully secured position appears to state the obvious."); In re Brown, 209 B.R. 874, 883–887 (Bankr.W.D.Tenn.1997) (transfers which satisfied collected funds overdrafts were not preferential since they satisfied existing security interests in debtor's deposits); Frigitemp, 34 B.R. at 1015 (holding that the application of funds deposited into a bank account used to pay an existing collected funds overdraft during the preference period was not a voidable preference due to the bank's security interest in such payments under a similar UCC provision in New York).

The source of the funds is not relevant in analyzing overdrafts arising from provisional credits. In Laws, the debtor was engaged in a check kiting scheme. The transfer at issue was $4,000,000 that the debtor borrowed from another bank when the defendant bank advised the debtor that it would no longer pay on the debtor's uncollected deposits. Laws, 98 F.3d at 1049. Nevertheless, the Eighth Circuit affirmed the district court's finding that the transfer was not preferential. The $4,000,000 transfer satisfied the overdraft but it did not improve the bank's position since the bank was fully secured in the deposits which provided the provisional credits and created the overdraft. Id. at 1052.

In sum, the Summary Judgment Order concluded that Counts I, II and III all failed as a matter of law to the extent the overdrafts cleared by the transfers arose from provisional credits. City National became a fully secured creditor to the extent of the provisional credit, even if it is treated as a debt, because of its security interest in the items for which provisional credit was given. Therefore, when the Debtor made a deposit to satisfy the negative collected funds balance, City National did not receive a payment on an unsecured debt. Rather, the bank's security interest was satisfied by the deposit. Thus, City National did not improve its position for preference purposes, as it was at all times a secured creditor.

## B. Preference Liability May Exist to the Extent that Transfers Satisfied Ledger Balance Overdrafts

█] Because of the Court's conclusions in the Summary Judgment Order that transfers curing overdrafts arising from provisional credits were not avoidable, the Plaintiff's focus shifted to deposits which cured ledger balance overdrafts, specifically, the deposits on July 20, 2000. As discussed in the Summary Judgment Order, these deposits may be recoverable as preferences, because the law described in Section A. above does not shield City National from potential liability for deposits curing ledger balance overdrafts. Unlike a collected funds overdraft, a ledger balance overdraft is a debt. Moreover, the bank's security interest in deposited items would not protect it because this security interest is only relevant to provisional credit extended on the deposited items.

Another hypothetical highlights the distinction. Assume on Day 1, the customer has no funds in the account and no uncleared checks. He deposits $200,000 in checks and the bank honors checks totaling $300,000. At the end of Day 1, there is a negative collected funds balance of minus $300,000, and a ledger balance overdraft of $100,000 since the customer received provisional credit for the $200,000 deposit. On Day 2, the customer wires $300,000 from an outside source into his account. Under this Court's analysis, $200,000 of the $300,000 transfer would not be avoidable as a preference since that amount of the negative collected funds balance arose from provisional credit on deposited items

and was not an antecedent debt. By contrast, $100,000 of the $300,000 could be the subject of a preference claim. First, the $100,000 ledger balance overdraft on Day 1 is an extension of credit and therefore an antecedent debt. *See Matter of Prescott*, 805 F.2d 719, 729 (7th Cir.1986). Second, the bank's security interest in the deposited items only secured the $200,000 provisional credit granted in respect of those items, not the $100,000 in additional credit granted by the bank.[3]

In sum, payments received by a bank to satisfy a debt arising from a ledger balance overdraft may be subject to avoidance as preferences.

## C. The Deposits into the Debtor's Account on July 20, 2000 Clearing the July 19, 2000 Ledger Balance Overdraft are Avoidable Preferential Transfers

The highest ledger overdraft balance or "darkest day" occurred on July 19, 2000, when City National issued a series of cashier's checks to the Debtor based solely upon the Debtor's promise to make deposits the following day. The issuance of these cashier's checks resulted in an undisputed ledger balance overdraft in the amount of $690,934.54.

City National contends that it provided "provisional credit" against this negative ledger balance based upon the Debtor's promise to make deposits on July 20th. However, to the extent that City National extended credit against funds that were not on deposit, these were not provisional

---

**3.** City National argues that the July 20th deposits were not preferential transfers because it had a security interest in the deposited items, citing *Frigitemp*, 34 B.R. at 1021. To the extent *Frigitemp* held that a security interest in *future* deposits provides a defense to a preference claim where the deposits clear ledger balance overdrafts, this Court disagrees. If the ledger balance overdraft is a debt, payment of that debt from a subsequent deposit may be a preference whether the deposit is made in cash, wired funds, or third party checks. Thus, the bank's security interest in the deposits made after the debt arose is irrelevant.

credits, as that term is used in this Opinion. Instead, the Debtor became indebted to City National for these overdrafts. The July 19, 2000 issuance of the cashier's checks was made when there was only $8,541.69 on deposit. City National issued the cashier's checks solely upon the representation by the Debtor that it would deposit sufficient funds the following day to cover these cashier's checks.

Unlike provisional credits against existing deposits, the credit extended by City National on July 19, 2000 through the issuance of cashier's checks was credit extended on future anticipated deposits. This constituted credit extended on a promise to pay. This credit is properly characterized as a debt. The deposits made on the following day to satisfy and clear the negative ledger balance paid this antecedent debt.

As stipulated by the parties, the transfers represented by the July 20th deposits were made while the Debtor was insolvent. Finally, the Trustee's direct testimony established that this transfer enabled City National to receive more than it would have received if the case were a case under Chapter 7, the transfer had not been made, and City National received payment of such debt pursuant to the distributions available under the Bankruptcy Code. Accordingly, the Trustee proved all elements of a preferential transfer under 11 U.S.C. § 547(b).

### D. The July 19, 2000 Ledger Balance Overdraft does not fit into the Conduit–Theory Exception in Chase & Sanborn

■■ City National argues that it is entitled to a case-law exception: a ledger balance overdraft is not a debt where a bank retains the power to dishonor the check or checks that, if and when honored, create the ledger balance overdraft, citing *In re Chase & Sanborn Corp.*, 848 F.2d 1196 (11th Cir.1988). In *Chase & Sanborn* the bank honored a check on the debtor's account, creating a ledger balance overdraft. Before honoring the check, however, the bank confirmed that the debtor was depositing replacement funds sufficient to cover the check. The bank obtained this confirmation by first learning from the debtor which financial institution would be transmitting the replacement funds and, subsequently, verifying with that financial institution that the funds were in fact on the way. Importantly, had the bank not obtained this confirmation, it could have dishonored the check the next morning preventing the ledger balance overdraft from arising. The Eleventh Circuit held that under these facts, the ledger balance overdraft was not a debt. The bank, the court reasoned, was a mere conduit because it decided to honor the check only after receiving confirmation from another financial institution that replacement funds were inbound. Thus, the ledger balance overdraft evinced not a debtor-creditor relationship between the debtor and the bank but rather a mere effect of funds passing from the debtor through the bank to a third party.

Although the Eleventh Circuit focused on the confirmation provided to the bank by the intermediate financial institution, the bank's power to dishonor the check was equally crucial. The power to dishonor the check creates the logical connection between the transfer of funds from the bank to the third party and the transfer of replacement funds from the debtor to the bank. The bank honors the check and transfers funds to the third party if and only if there are replacement funds inbound from the debtor. Because of this logical connection, the bank never enters

into a debtor-creditor relationship with the debtor.

The facts and holding in *Chase & Sanborn* are not applicable here for two reasons. First, the bank in *Chase & Sanborn* only honored the check that created the ledger balance overdraft "because it knew with absolute certainty" that the promised deposit was on its way. 848 F.2d at 1201. That fact was confirmed by the financial institution which was transmitting the deposit. By contrast, City National issued the cashier's checks on July 19th, which created the ledger balance overdraft, on the mere promise that the Debtor would make deposits the next day to cover the overdraft. *See Matter of Prescott,* 51 B.R. 751, 753, 756 (Bankr.W.D.Wis.1985) (holding that ledger balance overdrafts created "in the faith that the next day or two's deposits would right the balance" are avoidable preferences), *aff'd,* 805 F.2d 719 (7th Cir.1986).

The second distinguishing factor is that the bank in *Chase & Sanborn* could have dishonored the check giving rise to the overdraft on the following morning if it had not confirmed that the deposit had been wired. *Id.* at 1198. By contrast, City National failed to prove it could have dishonored the cashier's checks. The sole evidence that City National presented on the issue of whether it could have dishonored the cashier's checks was the testimony of Mr. Alemany. His testimony on this issue was conflicting and guarded. On direct, he testified that the cashier's checks could be dishonored. On cross-examination, Mr. Alemany acknowledged that dishonoring a cashier's check would be a rare and extraordinary action. Mr. Alemany's testimony did not convince the Court that City National could or would have dishonored the July 19th cashier's checks if the July 20th deposits were not made.

In sum, the simple distinction between the case at bar and *Chase & Sanborn* is this: The ledger balance overdraft in *Chase & Sanborn* was not a "debt" because the bank did not take a credit risk. It allowed the check which created the overdraft to clear only after it confirmed that money to cover the check had been wired. City National, on the other hand, did take a credit risk. It issued the cashier's checks which created the overdraft based solely on the Debtor's assurance that deposits would be made the following day. By doing so, City National incurred a credit risk and the overdraft is properly characterized as a debt.

### E. City National Failed to Establish either the Ordinary Course Defense or the Contemporaneous New Value Defense

At trial, City National argued that even if the transactions satisfied the elements of § 547(b), the transfers were not avoidable under the ordinary course defense in § 547(c)(2) or the new value defense in § 547(c)(1). Initially, the Court notes that neither of these affirmative defenses were included in the Affirmative Defenses raised in City National's Answer to Amended Complaint (CP# 16). Moreover, these defenses were not included in the Agreed Second Amended Pretrial Order (CP# 108). As a result, it is questionable whether these defenses should even be considered. The Court will not reach this procedural issue, since, as the following discussion shows, City National failed to prove either of these defenses.

City National asserts the ordinary course defense under § 547(c)(2). Because City National did not prove that the transfers were "made according to ordinary business terms," the Court finds that this defense fails.

Section 547(c)(2)[4] provides:

(c) The trustee may not avoid under this section a transfer-

(2) to the extent that such transfer was-

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

City National bears the burden of proof, which it must carry by the preponderance of the evidence. 11 U.S.C. § 547(g); *Miller v. Florida Mining and Materials (In re A.W. & Associates, Inc.)*, 136 F.3d 1439, 1441 (11th Cir.1998). Whether a transfer was "made according to ordinary business terms" is determined by examining industry standards. *A.W. & Associates*, 136 F.3d at 1442. The inquiry into industry standards is an objective one. *Id.* In examining industry standards, the Eleventh Circuit directs that bankruptcy courts focus upon "the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage." *Id.* at 1443 (quoting *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993)).

The only evidence in the record regarding industry standards is the testimony of Mr. Alemany. Although testimony by an employee of the creditor-defendant regarding industry standards is viewed suspiciously by some courts, *see, e.g., In re Toy King Distributors, Inc.*, 256 B.R. 1, 126 (Bankr.M.D.Fla.2000) (describing such testimony as "inherently sus-

pect"), there is no per se rule that such testimony fails to carry the burden of proof. *See In re Gulf City Seafoods, Inc.*, 296 F.3d 363, 368 n. 5 (5th Cir.2002) ("creditor, however, may satisfy its burden through testimony by its own company representatives about the practices of other creditors and debtors in the industry"); *Tolona Pizza*, 3 F.3d at 1033 (testimony of creditor's executive vice-president, who had extensive experience in the industry, was sufficient to prove industry standard). Thus, Mr. Alemany was competent to testify about industry standards.

Mr. Alemany's testimony, however, is not sufficient to carry the weight of City National's burden to establish an industry standard. Overall, Mr. Alemany's testimony on this issue was guarded and gave the impression of only a partial disclosure of industry practice. Mr. Alemany did testify that other banks would issue cashier's checks on the promise that those checks would be covered by the next day's deposits in order to accommodate a good or important customer. His testimony on this issue, however, was limited to the bare statement that other banks engaged in such an accommodation. For instance, although he cited the length of the relationship with the customer as a factor in determining whether that customer was good or important, he did not disclose what industry-wide factors sort merely long-term customers from important customers or promote short-term customers to important ones. Nor did he testify under what circumstances banks would refuse to make the accommodation to an important customer whose financial situation had deteriorated so much that the credit risk of the

---

**4.** Section 547(c)(2) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. This proceeding, however, is subject to the statute, as it existed, prior to the 2005 amendments.

accommodation exceeded the utility of pleasing that important customer.

These are only examples meant not to suggest what particular evidence is necessary to establish the industry standard but to illustrate that Mr. Alemany's testimony on the issue lacked sufficient detail. These details were necessary to establish the upper and lower bounds of the range of terms in which the industry engages in the cashier-check accommodation. Absent such details, Mr. Alemany's testimony was insufficient to convince the Court that it is more likely than not that City National's cashier-check accommodation for the Debtor was ordinary business practice in the banking community.

Moreover, despite Mr. Alemany's testimony at trial, in an earlier deposition on November 1, 2006, Mr. Alemany admitted that it was not standard practice to issue cashier's checks when there existed a negative ledger balance in a customer's account:

Q. If you issued a cashier's check—

A. Uh-huh

Q.—would you frequently, or was it normal practice for the bank in 2000—

A. Right.

Q.—to issue cashier's checks when there was a negative balance or negative ledger balance on the date that the checks were issued?

A. You normally don't do that. It's not common. You would do it only if you had a very, very good relationship with a client, that you trust that client to do good on the transaction.

(Nelson Alemany Dep. Tr. 19:7–20, November 1, 2006.) This testimony casts further doubt on City National's argument that the transaction was ordinary course.

City National also seeks to avoid liability under the contemporaneous exchange for new value defense under § 547(c)(1). This defense also fails because the Court finds that City National could not prove that the parties intended a contemporaneous exchange.

Under § 547(c)(1), the trustee may not avoid an otherwise preferential transfer to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.

Thus, to insulate an otherwise preferential transfer from avoidance by the trustee, the creditor must prove by a preponderance of the evidence that (1) it extended new value to the debtor, (2) the parties intended the new value and reciprocal transfer by the debtor to be a contemporaneous exchange and (3) the exchange was in fact substantially contemporaneous. *Official Unsecured Creditors' Committee v. Airport Aviation Services, Inc. (In re Arrow Air, Inc.)*, 940 F.2d 1463, 1465 (11th Cir.1991). "The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *Creditors' Committee v. Spada (In re Spada)*, 903 F.2d 971, 975 (3d Cir.1990) (citing *Matter of Prescott*, 805 F.2d 719, 727 (7th Cir.1986)) (citing *In re Wadsworth Bldg. Components*, 711 F.2d 122, 124 (9th Cir.1983)).

Here, City National's defense fails as a matter of law. As discussed above, the transaction between City National and the Debtor—delivering a cashier's check, essentially cash, on day 1 in anticipation of repayment on day 2—is a short-term open-

credit transaction. Such a transaction is inherently not contemporaneous and, therefore, cannot be intended to be contemporaneous.

### CONCLUSION

It may seem harsh to take a two day snapshot of a long-term banking relationship and find, for preference purposes, creation of a debt on day 1 (here July 19, 2000) and preferential repayment of that debt on day 2 (here July 20, 2000). Nevertheless, the Court concludes that the Trustee has established each of the elements of § 547(b) with respect to the July 19th "debt" and the July 20th "transfer" and that City National has failed to establish a legal defense. Thus, $690,934.54 of the deposits made on July 20, 2000, are avoidable preferential transfers pursuant to 11 U.S.C. § 547(b) subject to turnover by City National, pursuant to 11 U.S.C. § 550.

The Court will enter a Judgment in favor of the Trustee and against City National in the amount of $690,934.65 plus interest upon a determination of the Trustee's entitlement to, and calculation of, prejudgment interest. A separate Order will be entered setting a briefing schedule and hearing on this issue.

### ORDER DENYING MOTION FOR NEW TRIAL, MOTION FOR REHEARING AND MOTION TO ALTER OR AMEND MEMORANDUM OPINION

On June 4, 2007, City National[1] filed a Motion for New Trial, Motion for Rehearing and Motion to Alter or Amend Memorandum Opinion (the "Motion") (CP# 118). Subsequently, the Trustee filed his Response and Memorandum of Law in Opposition (the "Response") (CP# 119), and City National filed its Reply to Trustee's Response (the Reply) (CP# 123). (The Motion and Reply will be collectively referred to as the "Motion for Rehearing.") The Motion for Rehearing seeks reconsideration of the Court's Memorandum Opinion (CP# 114) entered May 25, 2007 finding that certain transfers made by the Debtor to City National as deposits into the Debtor's bank account at City National were avoidable and recoverable as preference payments pursuant to Bankruptcy Code §§ 547 and 550.

 A motion for rehearing or reconsideration is not a vehicle for relitigating old matters, or for offering evidence or theories of law that were available to a party at the time of the initial ruling. *See O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir.1992); *In re Ingersoll*, 124 B.R. 116, 123 (M.D.Fla.1991); *In re Investors Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 768 (Bankr.N.D.Fla.1994). Most of City National's arguments in the Motion for Rehearing were raised at or prior to trial and implicitly, if not explicitly, addressed in the Memorandum Opinion. Nevertheless, to reiterate, or clarify, the Court's legal conclusions, City National's Motion for Rehearing arguments will be addressed in this Order.

A. *The Gulf Bank Adversary is Inapplicable Because the Transfers There Were Between Accounts at the Defendant Bank*

 City National argues first that the transactions at issue here between itself and the Debtor are the mere "movement of funds," not "transfers" under 547. In support of this proposition, City National

---

1. Undefined terms are the same as those in this Court's Memorandum Opinion (CP# 114).

relies on *Feltman v. Gulf Bank,* Adv. No. 02–1514 (October 1, 2003) (the "Gulf Bank Adversary"), an earlier decided adversary proceeding in this bankruptcy case. This argument is unavailing because the two cases are distinguishable, as the Court previously explained. (Summ. J. Order 8–9, CP# 78, June 22, 2006.) In the Gulf Bank Adversary, the deposit of funds that cleared the overdraft in the Debtor's account came from another of the Debtor's accounts within the same bank.[2] As such, the movement of funds was not a transfer, but rather Debtor money going from one Debtor account at Gulf Bank to the other. Here, at least $690,934.65 in deposits of funds on July 20th came from different banks. These deposits from Debtor accounts at other banks were transfers of the Debtor's property. *See* 11 U.S.C. § 101(54).

B. *The Fact that Most of the Cashier's Checks were Payable to Locin or the Debtor is Irrelevant*

 City National argues in paragraphs 7 through 9 of its Motion for Rehearing that the issuance of the cashier's checks on July 19, 2000, were not transfers or the creation of a debt because the cashier's checks were issued to Locin or the Debtor. (Motion 4–5, ¶¶ 7–9.) This argument confuses transfers, which apply to payment of a debt, with transactions which result in creation of the debt. As the Trustee noted in his Response, "[t]he identity of the parties who received the cashier's checks is irrelevant." (Response 4, ¶ 14.) This Court agrees. For purposes of analyzing whether a debt arose, it does not matter to whom the checks were issued. The issuance of the checks was an extension of credit because the Debtor's account did not have sufficient cash or deposited items *when the checks were issued* to cover the checks. That is, to use the term emphasized in the Memorandum Opinion, issuance of the cashier's checks created a ledger balance overdraft and therefore a debt. (Mem.Op. 698–99.)[3]

C. *The Bank was Not Protected by Setoff Rights*

 City National argues next that § 547 preference liability is not applicable if the collecting bank has a right of setoff against subsequent deposits, arguing that setoffs are not transfers as defined in § 101(54) of the Bankruptcy Code. First, the Court questions whether this statutory argument was previously raised. If not, it cannot be considered a part of a Rule 59, Fed.R.Civ.P., Motion for Rehearing. *Stone v. Wall,* 135 F.3d 1438, 1442 (11th Cir.1998).

 Second, under the facts in this case, and under the case law cited by City National, the right of setoff did not apply to the July 20th transfers subject of the preference claim. City National relies primarily on *In re Frigitemp,* 34 B.R. 1000, 1018–20 (S.D.N.Y.1983). In *Frigitemp,* the court found that the bank and debtor engaged in a routine practice in which the bank would honor the debtor's checks of up to $50,000 "without requiring advance clearance or confirmation with [the debtor] that specific deposits were forthcoming to

---

2. This second account at Gulf Bank belonged to Locin. It was treated as the Debtor's account under an alter-ego theory.

3. Although hardly worth mentioning, City National also argues that the Court overlooked the fact that the Debtor wrote checks to City National on its account to obtain the cashier's

checks. This fact was not overlooked; it is just irrelevant. Whether the Debtor wrote checks to City National (to buy the cashier's checks) or wrote checks to third parties, the Debtor's account was debited creating the ledger balance overdraft.

cover the overdraft" and would "automatically" setoff the resulting overdraft with funds from subsequent deposits. *Id.* at 1018. An "overdraft debt" of $119,000 attributable to this routine practice was paid down over a period of approximately three weeks during the preference period. The court held that these deposits, which paid down the $119,000 overdraft debt, were not subject to preference liability and were setoffs, emphasizing that the "checks were not deposited to satisfy a specific indebtedness." *Id.* at 1019.

The Court's factual findings in this adversary are distinctly different. In particular, the Court found that neither the July 19th ledger balance overdraft nor the July 20th deposits were part of a routine practice between City National and the Debtor. For *Frigitemp's* routine-practice rule to apply, the ledger balance overdraft must be allowed without a decision by the bank. *See Frigitemp,* 34 B.R. 1000 at 1028 (such overdrafts were allowed "without requiring advanced clearance"). Mr. Alemany's testimony at trial established the opposite; advanced clearance was required. Moreover, the Frigitemp routine-practice rule also requires that the bank allow the overdraft ledger balance without requiring the debtor to identify specific subsequent deposits to clear that overdraft. *See id.* at 1018–19. Here, Mr. Alemany's testimony established that before City National allowed the July 19th ledger balance overdrafts it required the Debtor to identify specific future deposits.

City National attempts to attach significance to the fact that there were several instances during the preference period in which ledger balance overdrafts were eliminated by deposits made the following day. A bank's repeated tolerance of the debtor's overdrafts does not bless that tolerance with legal significance. *See Matter of Prescott,* 805 F.2d 719, 729 (7th Cir.1986). Thus, even if there were other instances

during the preference period in which ledger balance overdrafts were cleared by next day deposits, this is not a "routine practice" as defined in *Frigitemp.* As noted above, a deposit is not subject to setoff under the *Frigitemp* standard where, as here, the overdraft was allowed based upon the Debtor's representations that specifically described deposits would be made the following day. Moreover, if the Motion for Rehearing is rearguing common practice in the context of a § 547(c)(2) ordinary course of business defense, that defense was fully considered and rejected. (Mem.Op. 701–03.)

Other courts have rejected the setoff defense in similar circumstances in which a deposit is accepted with the specific intent to clear an overdraft. *See Prescott,* 805 F.2d at 729 ("[i]f the deposit is accepted by the bank with an intent to apply it on a pre-existing claim against the depositor rather than to hold [it] subject to the depositor's checks in ordinary course, ... the deposit is viewed legally as a transfer in payment of debt") (citations and internal quotations omitted); *Pereira v. Summit Bank,* 2001 WL 563730 (S.D.N.Y.2001) (right of setoff does not apply when a deposit is accepted by a bank with an intent to apply it on a pre-existing claim against the debtor). Mr. Alemany's testimony was that City National issued the cashier's checks resulting in the July 19th ledger balance overdraft only because the Debtor promised sufficient deposits would be made on July 20th to clear the July 19th ledger balance overdrafts. This testimony is dispositive on the factual issue of intent. Thus, there is no setoff because the July 20th deposits were made with an intent to clear the July 19th ledger balance overdrafts.

### D. *The Laws' Decision Does Not Support the Bank's Motion*

City National also argues that the Court misapplied the holding in *Laws v. United*

*Missouri Bank of Kansas City*, 98 F.3d 1047 (8th Cir.1996). It did not. First, City National states that in *Laws*, "the *negative ledger balance* was paid from loan proceeds that were wired by another bank" (Motion 7–8, ¶ 11) (emphasis added). That characterization of the account balance is incorrect. As explained at length in the Memorandum Opinion, *Laws* (and this Court) focused on the distinction between a "negative collected funds" balance and a "negative ledger balance." (Mem.Op. 696–99.) The payment analyzed in *Laws* cured a negative collected funds overdraft, *not* as City National stated, a negative ledger balance.

Second, to the extent City National's argument notes that the transfer in *Laws* was not from collection of the deposits which gave rise to the provisional credits, the Court addressed this point head-on in the Memorandum Opinion at pages 698 and 699. As explained, the security interest defense still applied. The transfer which satisfied the overdraft did not improve the bank's position "since the bank was fully secured in the deposits which provided the provisional credits and created the [collected funds] overdrafts." (Mem. Op. 698 (*citing Laws*, 98 F.3d at 1052).)

E. *The Bank was Not Protected by an Alleged Security Interest in Future Deposits*

Finally, City National argues that it was protected by a security interest in the July 20th deposits, i.e., in *future* deposits, *citing Frigitemp*. Part of the court's analysis in *Frigitemp* relating to provisional credits was cited favorably by this court in the Summary Judgment Order, at 14–15, and in the Memorandum Opinion. The section of *Frigitemp* relied upon in this portion of the Motion for Rehearing addressed a different issue. In this later section of *Frigi-*

*temp*, discussing certain overdrafts which were allowed by the bank only after the debtor identified specific subsequent deposits, the court did shield those subsequent deposits from preference liability. 34 B.R. at 1021. The court relied on two alternative theories in so holding. First, since it found that the bank extended credit—that is allowed the overdrafts—because the debtor specifically identified future deposits, it ruled that such a transaction was "properly viewed as a 'contemporaneous exchange for new value.'" *Id.* This Court expressly considered the contemporaneous-new-value defense and rejected it. (Mem.Op. 703–04) Second, the *Frigitemp* court found that under the applicable New York UCC section the bank held a security interest in the specifically-identified future deposits. *Id.* at 1022.

 In its Memorandum Opinion, this Court expressly disagreed with *Frigitemp* to the extent it suggested a possible security interest in *future* deposits could provide a preference defense. (Mem. Op. 699 n.3) Once again, it is important to focus on the distinction between collected funds overdrafts arising from provisional credits and ledger balance overdrafts. When a collected funds overdraft results from provisional credits granted on *present* deposits which have not yet cleared, a bank's security interest in those deposits is a shield from preference liability. When funds (or new deposits) come in to clear the *collected funds* overdraft, the bank does not improve its position and the debtor does not suffer a diminution of its assets, since the transaction results in the release of the security interest. (Mem.Op. 697–99.)

Deposits into a debtor's account (like the July 20th deposits at issue here) are entirely different when the deposits are applied to cure an existing *ledger balance* overdraft. Under these circumstances, the

bank's position is improved and the debtor's estate diminished. To state, as *Frigitemp* did, that the bank may be protected by a security interest in future deposits makes no sense. City National extended credit when it issued the cashier's checks on July 19th. It did so because the Debtor was a good customer and the bank accepted its assurance that deposits would be made the next day. City National, however, had no legal right to compel the Debtor to make the deposits the following day. Thus, if the Debtor had deposited the July 20th items into an account at another bank, and then filed bankruptcy, City National would have been an unsecured creditor for $690,000 and the Debtor's estate would have had an additional $690,000 in assets for distribution pro rata to all of its unsecured creditors. Simply stated, that is why it is a preference.

In sum, having reviewed the Motion, the Reply, and the Response, the Court finds that no issues justifying rehearing or reconsideration have been raised. The Court's ultimate conclusions are unchanged. Deposits that cleared negative collected funds balances arising from provisional credits on deposited items are not avoidable as preferences. However, deposits paying down a debt arising from a ledger balance overdraft, like the July 20th deposits here, are transfers avoidable under § 547 of the Bankruptcy Code. Therefore, it is—

**ORDERED** that the Motion is **DENIED.**